**In re Samuel J. FRABIZZIO, a Member of the Bar of the Supreme Court of the State of Delaware.**

Supreme Court of Delaware.

Submitted: May 7, 1985.

Decided: Aug. 30, 1985.

Samuel R. Russell of Biggs & Battaglia, Wilmington, for respondent.

L. Susan Faw, Disciplinary Counsel for the Bd. on Professional Responsibility, Wilmington.

Before McNEILLY, MOORE and CHRISTIE, JJ.

PER CURIAM:

This matter is before the Court pursuant to Rule 9(e) of the Rules of the Board on Professional Responsibility for review of the Board's recommendation to the Court that disciplinary action is warranted against Respondent upon the charge of a violation of DR1–102(A)(4) of the Delaware Lawyers Code of Professional Responsibility which provides that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. The Board's recommendation followed a hearing before a panel of the Board on Febru-

---

ary 14, 1984. A draft report of the Board was issued on November 14, 1984 to which counsel to Respondent filed exceptions pursuant to former Supreme Court Rule 63(d), (repealed effective July 1, 1984). The Board thereafter amended its draft and filed the following dated January 8, 1985:

## FINAL REPORT

### I

"The special panel of the Board convened at the direction of the Chairman consisted of Joseph H. Flanzer, Vice-Chairman, Susan C. Del Pesco, Joseph W. Maybee, Richard F. Stokes and F. Alton Tybout find disciplinary action to be warranted upon the charge of a violation of DR1–102 pursuant to a Rule on an Order to Show Cause issued on November 11, 1983 and heard on February 28, 1984. The charge is that the respondent engaged in a conduct involving misrepresentation in violation of DR1–102(4) in that he knowingly prepared and issued different settlement sheets, one to the lender and one to the seller, in a commercial real estate transaction. The findings of fact and conclusions of law concerning this matter are set forth in this report.

"(1) The Order to Show Cause asserts that neither settlement sheet forwarded by the respondent on June 1, 1979, one to City and one to the Lank group, reflected 'the true facts of the transaction.' The panel does not believe it is necessary to resolve that aspect of the charge. Whether there were one or two or more 'transactions' may be considered principally a matter of semantics. The gravamen of the Order to Show Cause concerns the distribution of different settlement sheets, not the matter of which one, if either, was correct."

### II

### FINDINGS OF FACT

"1. The respondent has a general practice of law with an emphasis on real estate and commercial law. He has been a member of the Delaware Bar since 1971.

"2. Lank was one of the three co-owners of the land sold. Hereafter, the sellers are referred to as the Lank group. Lank was the only one of the owners to testify. The Lank group received from a real estate agent a proposed contract of sale of the land to Landmark Group, apparently a name used by one Paul Linn, for $105,000. The proposed contract provided for $1,000 to be paid at the time of the execution of the contract, $24,000 in cash at the settlement and an $80,000 purchase money mortgage to be subordinate to construction and land development financing to be secured by Landmark. The contract was executed on January 16, 1979. The contract anticipated the building of a housing development.

"3. Thereafter a document was prepared entitled 'Assignment' dated February 16, 1979, purporting to assign Landmark's rights in the contract to Huber for $30,000. That assignment is attached to PX,1F but was not attached to the contract when the Lank group signed it. Lank did later learn that there had been an assignment but this was not a matter of concern to him.

"4. Huber prepared or had prepared a document purporting to be a contract for the sale of the same land by Lank (not the Lank group) to Huber. It recited a sale price of $135,000 and made no reference to a purchase money mortgage. Huber forged Lank's signature on the document. The fraudulent contract is a document clearly prepared by a person familiar with carefully drawn contracts for the sale of land to be used for development.

"5. Huber took the fraudulent contract to City Federal Savings and Loan Association (City) and on the basis of it secured financing. In consideration for a mortgage, he was to obtain $75,000 to finance the purchase of the land and $94,000 for land development. It is clear that the $75,000 was being loaned for the land purchase with the understanding the buyers would put up $60,000. The financing by City was confirmed by letter to Huber dated April

24, 1979. On the same day City also confirmed a construction loan commitment to Huber in the amount of $838,500.

"6. As the transaction ultimately was carried out, Huber received $75,000 from City as proceeds from the mortgage to finance the purchase of the land. He paid the Lank group $24,000 (less certain charges) and executed the $80,000 purchase money mortgage to the Lank group.

"7. Respondent first met Huber in March, 1979. He asked respondent to represent him in the closing. He had the original contract executed by the Lank group with him at that time. He did not have a copy of the assignment at the time he met Huber in April, 1979. Respondent never saw the fraudulently executed contract until after the events constituting the fraud were discovered in March, 1980.

"8. The original contract called for financing to be arranged within 30 days of the date of the contract. It is not clear how that date was extended. However, at some point respondent called Lank requesting additional time for the settlement. He also later called and told Lank that Huber and not Landmark would be the purchaser. This was not a matter of importance so far as Lank was concerned.

"9. Respondent testified that he gave instructions to his secretary about the preparation of the settlement sheet in early May. He did not review the settlement sheet after it was prepared. That settlement sheet showed a sales price of $135,000 and showed no purchase money mortgage. That settlement sheet was forwarded to Huber who returned it shortly thereafter. The respondent's secretary put the settlement sheet in the file without respondent reviewing it at that time.

"10. Respondent testified that he reviewed the settlement sheet forwarded to Huber shortly after it was returned and found that the one which had been sent to Huber was incorrect. At some point the respondent wrote 'cancel for settlement on June 1' on a photocopy of that settlement sheet. The copy of the sheet before the

Board which had the original writing on it was itself a photocopy. He testified that he thereafter prepared a settlement sheet showing a sale price of $105,000, a purchase money mortgage of $80,000 and an entry entitled 'PRINCIPAL AMOUNT OF NEW LOANS LAND' $75,000. The balance sheet showed the gross amount due from the borrower to be $115,425.30 (including various charges above the $105,000 sale price) and cash due to the borrower of $9,574.70.

"11. Respondent sent Lank in May the deed for execution by the owners and also three settlement sheets showing a price of $105,000. Lank had the deed executed by the owners and signed the settlement sheets and sent them back to respondent.

"12. Klein was the Delaware attorney handling the real estate settlement on behalf of City. He testified that City's loan of $169,000 was intended to be $75,000 for land acquisition and the remaining for site development. City's understanding, in view of the purported purchase price of $135,000 was that the borrower was putting up $60,000 of his own money. The respondent's own real estate expert, Kristol, believed that City would normally want to know what kind of equity the buyer was going to have in the contract because it is important that the bank determine the ratio of debt to value. The amount of equity in the buyer is important.

"13. Klein reviewed the documents for the closing and noticed an absence of a prohibition against second liens. He spoke to respondent and told him to include a prohibition against further liens on the property. The expert on real estate transactions testifying on behalf of the respondent, Kristol, testified that such a clause is standard in mortgages by most banks since there is almost always a provision against secondary financing without the consent of the lender. Such a provision was in fact inserted in the mortgage.

"14. There is a direct conflict of testimony on the respondent's knowledge con-

cerning the prohibition against secondary financing. Klein testified that there was a specific telephone discussion with Frabizzio on the need for the secondary financing clause and Klein within a week before settlement instructed that it be inserted in the mortgage. Respondent contends that he did not know about the prohibition against secondary liens. However, respondent agrees that the 'rider' containing the 'secondary financing' clause was handed to him by Klein with instructions that it be inserted in the mortgage. He denies discussing it with Klein. Respondent makes no claim that he disclosed to Klein the mortgage to the Lank group.

"15. On June 1, 1979, the settlement sheet showing a sale price of $135,000 and showing no purchase money mortgage was delivered to City following the closing. The settlement sheet showing a sale price of $105,000 was delivered to Lank following the closing. The respondent filed the purchase money mortgage at a time that would make it subordinate to City's mortgage.

"16. The nature of the transaction was such that neither City nor the Lank group would learn of the real transaction involving the other so long as Huber maintained the payments to City on its mortgage and to the Lank group on the purchase money mortgage. Apparently the payments were maintained for some period of time. In 1980, however, the City mortgage went into default. City's counsel, anticipating a foreclosure proceedings, had a title search on the property which disclosed the second mortgage to the Lank group. City's attorney contacted Lank and, in the ensuing exchange of information between Lank and City's attorney, the details of the transaction, including the discovery of the fraudulently executed contract, were uncovered.

"17. Respondent explains the delivery of the different settlement sheets to the lender and to the seller by stating that it must have occurred that an 'incorrect' settlement sheet remained in the file unmarked as 'cancelled' and that this sheet was inadvertently delivered to City while the sheet which respondent calls the 'correct' sheet was delivered to Lank."

## III

### CONCLUSIONS OF FACT

"The Board finds that there are a number of valid conclusions of fact that can be drawn from the facts set forth above:

"1. Huber's scheme to defraud City and the Lank group could not have had any chance of success unless events occurred precisely as they did occur. Had Klein received a settlement sheet showing a sale price of $105,000 and an $80,000 purchase money mortgage, the transaction would have been wholly unacceptable to City since it was contrary to City's understanding of the sale price as $135,000 and would have revealed financing $40,000 over the sale price. Had Lank received a settlement sheet showing a sale price of $135,-000 and no purchase money mortgage it is highly probable that he would have inquired about the details of the transaction. Had City known of the purchase money mortgage, Klein would have recognized that it was in direct conflict with the provision he had insisted be put in the mortgage prohibiting such financing.

"2. The Board finds it improbable that the respondent was unaware of the prohibition against secondary financing, particularly under the circumstances of this case. There are two reasons. Expert evidence showed that such prohibitions are commonplace in bank mortgages. Klein established satisfactorily that he emphasized to the respondent within a week before the closing the need for his provision in the mortgage.

"3. The Board finds unacceptable the proposition that the respondent considered this transaction unremarkable. As the respondent interpreted the transaction according to the $105,000 settlement sheet, the financing involved a $75,000 mortgage to City for the purchase of the land and $80,000 purchase money mortgage. This

means that there was financing of $155,000 on a purchase of land costing $105,000.* The financing of the purchase of real estate by two mortgage transactions together providing almost 40 per cent over the purchase price is so contrary to custom and practice that no attorney having any degree of experience in real estate and no person experienced in commercial transactions could consider it other than so improbable as to require the closest scrutiny.

"4. The respondent had possession of the initial Lank group contract which provided in the addendum that the purchase money mortgage designated as 'second purchase money mortgage' was to be subordinate only to 'institutional mortgage financing necessary for development and construction of 13 single family homes'. The Board does not accept the proposition argued by the respondent that he reasonably could have considered the phrase 'mortgage financing necessary for development and construction' to mean purchase of the land. The Board believes that an attorney experienced in real estate transactions would have recognized that the contractual agreement did not authorize any other mortgage for the purchase of the land as opposed to its development.

"5. The Board finds unconvincing the explanation of the preparation of the $135,000 'incorrect' settlement sheet. While the respondent explains that his secretary prepared the 'incorrect' settlement sheet by mistake, there is no explanation in the record of how the mistake came into being. Since the incorrect settlement sheet showed Lank as the seller, there is no indication why the sale price was shown as $135,000. Since the contract available to the secretary showed a purchase money mortgage of $80,000, there is no explanation of why that was deleted, particularly in view of the fact that the same secretary

presumably prepared the purchase money mortgage itself.

"6. The Board fails to understand how it could have occurred that the original marked 'cancelled' copy of the 'incorrect' settlement sheet could have been on a photocopy while the original settlement sheet, apparently delivered to City, remained unmarked in the respondent's file and how the respondent's secretary, having been chastised for preparing an incorrect settlement sheet, could have inadvertently taken that same settlement sheet and forwarded it to City while taking a different settlement sheet from the same file to forward to the Lank group.

"The Board recognizes some perplexing aspects to the entire sequence of events:

"A. From the very outset of the preparation of the fraudulent contract, Huber could not have expected to succeed in his fraud unless the circumstances of the closing were just as they did in fact occur. How could he know that Lank would not attend the closing? The evidence indicated and the Board concludes that the failure of the seller to appear at closings is by no means unusual and is in fact commonplace in the Wilmington area particularly among persons experienced in real estate transactions as Lank is. The fact that Lank had, prior to the closing, signed and returned a settlement sheet is further indication, by local custom, that he would not attend the closing.

"B. If the 'correct' settlement sheet was intended to deceive the sellers, why insert on line 202 of the settlement sheet 'principal amount of new loans land' in the amount of $75,000 and show at the bottom line 303 cash payable to the borrower of $39,574? Had Lank examined the settlement sheet with the experience of an attorney conversant with real estate transac-

---

* While the respondent contends that Huber paid $135,000 for the land because he paid $30,000 for the assignment from Landmark, this fact was not apparent by inspection of either settlement sheet. The settlement sheet delivered to the Lank group showed a sale price of $105,000. The fraudulent contract delivered to City showed a sale price of $135,000 payable to Lank. The respondent's contention was that he intended the settlement sheets to reflect the $105,000.

tions he might have thought that the settlement sheet indicated combined loans of $155,000 for the purchase of the land. This should have seemed highly improbable for a person of Lank's experience. However, he could also reasonably have interpreted it as a loan for the land development to which the Lank group's purchase money mortgage was to be subordinate. In order to have become suspicious of the transaction it would have been necessary for Lank to suspect the fraud which Huber was in fact perpetrating. In any event, Lank testified that he did not read the settlement sheet carefully. He did not care what the land loan was. There was only one mortgage to be ahead of the purchase money mortgage and that was the development and construction mortgage. The Board does not find a satisfactory explanation for the insertion of the reference to $75,000. However, that fact does not dissuade the Board from its conclusion."

## IV

### CONCLUSIONS OF LAW

"1. The measure of proof applied by the Board in resolving the factual question before it is stated in *In Re Morford,* Del. Supr., 80 A.2d 429 (1951). The evidence must prove the charges 'by a convincing preponderance of the evidence ... (which means that) ... this requirement is something less than is required in a criminal prosecution and is something more than is required in a civil proceeding.' The requirement of a 'convincing preponderance of evidence in the record' was reaffirmed in *In Re Reed,* Del.Supr., 394 A.2d 221 (1978) (p. 225).

"2. The respondent violated the provisions of Disciplinary Rule 1–102(4) in that he engaged in conduct involving a misrepresentation in that he knowingly distributed one settlement sheet to the sellers of the real property, the Lank group, while distributing another and different settlement sheet to City, the mortgagee, with full knowledge that each recipient, pursuant to the invariable practice in real estate trans-

actions, would assume that the other party to the transaction had received an identical settlement sheet."

Respondent contends that although he might be found negligent in his handling of the transaction, there is insufficient evidence in the record to sustain the findings of fact and conclusions of law reached by the Board. We disagree. Clearly there is sufficient evidence in the record to support the Board's findings and conclusions, and we affirm them.

Having duly considered the findings of fact and conclusions of law together with the briefs filed in this Court, oral argument of counsel and the record from the proceedings before the Board, we conclude that Respondent's course of conduct in this matter requires nothing less than a period of suspension from the practice of law as a member of the Delaware Bar. Accordingly, it hereby is ADJUDGED and ORDERED that Respondent be disciplined as follows:

(1) That the Respondent be prohibited from engaging in the private practice of the law as a member of the Delaware Bar for a period of two years, commencing on the fifteenth day of September, 1985, and ending on the fourteenth day of September, 1987; and

(2) That during such period, the Respondent shall not (a) share in any legal fees arising from clients or cases referred by the Respondent during the period of suspension to any other attorney, or (b) share in any legal fees earned for services by others during such period of suspension; and

(3) That the Respondent shall arrange with another member of the Delaware Bar to protect the interests of any clients of the Respondent during the period of suspension; and shall submit to this Court on or before November 15, 1985, a certificate of compliance with this paragraph, co-signed by the attorney who has undertaken the said assignment. Com-

pare *Matter of Reardon,* Del.Supr., 369 A.2d 666 (1977).

(4) That during such period the Respondent shall make arrangements with counsel for the Board on Professional Responsibility for the payments of costs in the amount of $1,617.32. In the event the amount of said costs is not paid on or before September 14 1987, the suspension shall remain in full force and effect until paid in full.

(5) That this Opinion and Order be disseminated by Disciplinary Council in accordance with Rule 3 and Rule 14 of the Rules of the Board on Professional Responsibility.

## ORDER

McNEILLY, Justice.

This 25th day of September, 1985,

Having duly considered Respondent's Motion for Reargument in captioned matter, it appears to the Court that:

1. Respondent moves this Court to strike the sanctions imposed contending there is insufficient evidence in the record to support the Board's finding, and this Court's affirmance, of an intentional violation of Disciplinary Rule 1–102(A)(4), in that he engaged in conduct involving an intentional misrepresentation during a real estate transaction ultimately causing substantial loss to his malpractice insurer.

2. Respondent further contends the Court did not address his objections to the report of the Board filed under Rule 9(e) of the Rules of the Board on Professional Responsibility, and that he was found guilty of a violation with which he was not charged nor had notice of.

3. Respondent alternatively prays for a reduction of the sanctions by reason of his otherwise record of good conduct, his cooperation with the Board, the substantial penalty suffered by him in defending the malpractice suit brought against him, and the lesser sanctions imposed upon other attorneys involved in disciplinary proceedings.

4. There is no merit to any of Respondent's contentions that this Court should strike its Order of August 30, 1985 imposing a two-year period of suspension from the practice of law as a member of the Delaware Bar, nor do we find justification in his Motion for Reargument for reargument or reduction of the sanction imposed.

NOW, THEREFORE, IT IS ORDERED that the Motion for Reargument or reduction of the sanction imposed be, and it hereby is, DENIED.

IT IS FURTHER ORDERED that the commencement of the two-year period of suspension be amended to begin on the first day of October, 1985 and to end on the thirtieth day of September, 1987.

In all other respects the Opinion and Order of August 30, 1985 shall remain in full force and effect.