In the Matter of a Member of the Bar of the Supreme Court of the State of Delaware Anthony A. FIGLIOLA, Jr., Respondent.

No. 303, 1994.

Supreme Court of Delaware.

Submitted: Jan. 5, 1995.
Decided: Jan. 26, 1995.
Rehearing Denied Feb. 14, 1995.

Jeffrey M. Weiner, Wilmington, for respondent.

David Curtis Glebe and Matthew F. Boyer (argued), Office of Disciplinary Counsel, Wilmington, for Board on Professional Responsibility.

Before VEASEY, C.J., WALSH and BERGER, JJ.

PER CURIAM:

This matter is before the Court pursuant to Rule 9(e) of the Rules of the Board on Professional Responsibility. Respondent, Anthony A. Figliola, Jr. ("Figliola"), is a member of the Bar of this Court who was admitted to practice in 1978. Figliola seeks review of a report dated August 9, 1994 (the "Report"), issued by the Board on Professional Responsibility (the "Board").[1] In the

Report, the Board found that Figliola violated four rules of the Delaware Lawyers' Rules of Professional Conduct (the "DLRPC"), and recommended that Figliola be suspended for thirty days and agree to submit to four corrective conditions.[2]

Figliola does not challenge the Board's findings concerning the DLRPC violations. Rather, he maintains that the Board failed to consider certain mitigating evidence in recommending its sanction. Figliola further contends that the Board-recommended sanction is too harsh given his lack of prior disciplinary record, his willing cooperation with the Office of Disciplinary Counsel ("ODC"), and his complete restitution of the funds taken. For the reasons set forth below, we sustain the Board's finding that Figliola violated four rules of the DLRPC. We determine, however, that the Board-recommended sanction of thirty days neither reflects the severity of Figliola's violations, nor serves the DLRPC purposes of fostering public confidence in the Bar, preserving the integrity of the profession, or deterring other lawyers from similar misconduct. Accordingly, we have concluded that the appropriate sanction is a six month and one day suspension with requirements for reinstatement in addition to those imposed by the Board.

## I. FACTS

Figliola operated as a sole practitioner from the date of his admission to the Bar until 1985. In April 1985, Figliola and Philip J. Facciolo, Jr. ("Facciolo"), formed a two-person law partnership (the "Firm"), agreeing that they would share equally Firm profits generated from the practice of law. Figliola maintained all three of the Firm's accounts—the attorney's account (also known as the operating account), the client escrow account and the real estate account—from the Firm's inception until late 1986.

---

1. The Board is an agency of this Court. Supr. Ct.R. 62; *In re Kennedy*, Del.Supr., 472 A.2d 1317, 1318–19, *cert. denied*, 467 U.S. 1205, 104 S.Ct. 2388, 81 L.Ed.2d 346 (1984).

2. The Board recommended that Figliola agree to:
 (1) Submit to periodic audits of his Firm's real estate account;

(2) Cease using his personal drawing account in connection with his Firm's practice, or comply with DLRPC Rule 1.15(d);
(3) Change the name of the real estate account to reflect its fiduciary nature; and
(4) Pay the costs of this investigation pursuant to Board Rule 29.

In late 1986, Facciolo discovered that Figliola was not maintaining these accounts properly. At that point, Facciolo took responsibility for the operating and escrow accounts, spending several months reconstructing transactions and correcting records. Facciolo left the responsibility for the real estate account with Figliola, assuming that, with the reduced administrative burden, Figliola could correct the deficiencies in the account and properly maintain it thereafter.

Between August 1986 and July 1992, Figliola issued from the real estate account, for his personal benefit, over 150 checks totalling more than $24,500.[3] This money represented funds earned by the Firm with regard to real estate transactions. Additionally, accountants retained by the Clients' Security Trust Fund ("CSTF"),[4] performed a compliance check on the Firm's accounts in December, 1987. The accountants found that Figliola had failed to perform the required monthly bank reconciliation of the real estate account and had neglected to prepare a monthly real estate fiduciary fund reconciliation to a list of escrow funds held.[5]

Facciolo discovered the diversion of Firm fees in July, 1992. He then compiled a list of suspect transactions and discussed his concerns with Frederick R. Funk, Esq. ("Funk"), a real estate attorney and friend of both Facciolo and Figliola. Facciolo and Funk confronted Figliola at the end of July, 1992. Figliola retained counsel and an accountant and ultimately reimbursed the Firm for personal payments totalling $24,500. Figliola did not pay any interest on this reimbursement, nor, apparently, was interest required by Facciolo.

In December 1992, Figliola informed Facciolo of certain checks that he had written from his personal Wilmington Savings Fund Society drawing account ("WSFS Account"), to advance client costs.[6] Figliola claimed that he had advanced more than $12,000 in personal funds and asked for credit for these advances. Figliola was unable to establish, however, that more than $6,000 of the $12,000 were legitimate disbursements relating to Firm matters.[7]

Despite the fact that disbursements were four times as great as advancements, Figliola maintained that he believed that he was entitled to the Firm fees that he withdrew, claiming that these fees offset client costs previously advanced by him. He admitted, however, that he never kept any type of record of amounts advanced or disbursed. Further, Figliola's descriptions of certain disbursements in the Firm's ledger tended to disguise personal disbursements as legitimate payments related to real estate transactions.

In addition to Figliola's unauthorized withdrawal of certain real estate account funds, Facciolo also discovered that Figliola had used client funds in an unauthorized manner. Figliola used funds belonging to Campbell Young ("Young")[8], a client, to help satisfy a judgment for the benefit of another client. Although Figliola admitted that he did not obtain the necessary authorization, he stated that "it was just easier to do it [this way]." Figliola eventually restored the funds, but only after Facciolo confronted him.

Figliola also withdrew $21,831 from the real estate account and placed this money in his nonfiduciary drawing account. Although this money belonged to his in-laws, and they had asked him to move the money from the escrow account to an interest-bearing ac-

---

3. Figliola used some of the money at issue to pay personal credit card bills, auto expenses and utility bills for his vacation home.

4. CSTF is now the Lawyers' Fund for Client Protection, but will continue to be termed CSTF in this Opinion to avoid confusion. Like the Board, it is an agency of the Court. *See* Supr. Ct.R. 66.

5. By June of 1988, Figliola corrected the reconciliation deficiencies.

6. Figliola had used this drawing account during his solo practice prior to 1986, and continued to use the account for a tax preparation business unrelated to the Firm.

7. Although Figliola could prove that one $6,000 check was a legitimate advance for client costs, he could not provide any documentation to tie the remaining checks to specific cases.

8. To protect the identity of the client the Court has used a pseudonym. *See* Bd.Prof.Resp.R. 13(d).

count, Figliola's deposit of the funds in his noninterest-bearing drawing account did not satisfy his in-laws' request.[9] Figliola returned $13,689 to the escrow account after Facciolo questioned him in December 1992.[10]

After conducting a hearing and considering post-hearing submissions by both parties, the Board issued its Final Report on August 9, 1994. The Board found clear and convincing evidence that Figliola "realized that he had withdrawn from the Firm real estate account far more than he had advanced for client costs from his [drawing] ... account," noting that Figliola disguised payments he made to himself to make them look as though they were legitimate payments dealing with real estate settlements. Respondent's Appendix at 105, *In re Figliola*, Bd. Case No. 14, 1993, slip op. at 3 (August 9, 1994) (Final Report of the Board). The Board found that Figliola's "pattern of taking Firm funds from the Firm real estate account to pay his personal bills shows at least a reckless disregard for his partner's interest in the Firm funds and constituted more than sloppy bookkeeping." Appendix for Respondent at 105, *In re Figliola*, slip op. at 4. The Board also found that Figliola had disbursed $8,000 in funds belonging to a client without that individual's permission, for the benefit of another client, and failed to invest $21,831 belonging to his in-laws in an interest-bearing account, as per their instructions.

Based on these findings the Board found that Figliola had violated DLRPC Rules 1.15(a), 1.15(d), 8.4(c) and 8.4(d). It recommended that Figliola: (1) be suspended no more than thirty days; (2) submit to periodic audits of the real estate account over the next two years without prior notice; (3) discontinue using his drawing account in connection with his practice, or bring it into conformity with DLRPC 1.15(d); (4) change the name of the real estate account to reflect its fiduciary nature, or discontinue using it in connection with Firm business; and (5) pay the costs of this investigation pursuant to Board Rule 29. On August 29, 1994 Figliola filed Objections to the Report with the Court.

## II. FINDINGS AND CONCLUSIONS OF THIS COURT

Figliola alleges that the Board erred in failing to consider four possible mitigating factors when it determined his sanction: (1) The impact of the 1986–88 CSTF compliance check; (2) Figliola's proof of client advances; (3) Figliola's father-in-law's affidavit; and (4) Figliola's ability to "cover" Young's funds.

 In cases charging violations of the DLRPC, this Court independently reviews the Board's findings of fact and conclusions of law. *In re Agostini*, Del.Supr., 632 A.2d 80, 81 (1993). The scope of review is whether the record below contains substantial evidence to support the Board's findings. *Id.*; *In re Brewster*, Del.Supr., 587 A.2d 1067, 1069 (1991). " 'Findings by the Board relating to disputed issues of fact and credibility will not be reversed by the Court so long as they are supported by substantial evidence.' " *In re Tos*, Del.Supr., 610 A.2d 1370, 1372 (1992) (quoting *In re Green*, Del.Supr., 464 A.2d 881, 887 (1983)). The Court reviews the Board's conclusions of law *de novo*. *In re Barrett*, Del.Supr., 630 A.2d 652, 656 (1993). This case requires the Court to consider Figliola's allegation that the Board erred in failing to consider certain mitigating circumstances. We conclude that Figliola's contentions are without merit.

### A. CSTF Compliance Check

Figliola claims that the CSTF compliance check, which revealed that Figliola had failed to perform the required monthly bank reconciliation, lulled him into a false sense of security with regard to his personal withdrawals from the real estate account. Since the accountants did not call these withdrawals to his attention, Figliola believed that they were proper. Figliola maintains that the Board erred in failing to consider this information as a mitigating circumstance.

 Figliola's contention is not persuasive. Figliola presented this factor to the Board in general terms, *i.e.*, he did not refer to it specifically as a mitigating circumstance.

---

9. Figliola's in-laws received no interest despite his holding the relevant money for three years.

10. Figliola's in-laws authorized him to disburse $8,142.00 of the original sum on their behalf.

Even though the Board failed to highlight this factor as a mitigating circumstance in the Report, there is no evidence that it failed to consider it. Disbarment is a possible sanction for knowing or reckless misappropriation of firm or client funds. *See In re Higgins,* Del.Supr., 582 A.2d 929 (1990) (disbarring attorney for knowingly misappropriating funds); and *In re Sullivan,* Del.Supr., 530 A.2d 1115 (1987) (disbarring attorney for failing to maintain accounts, offering false testimony to the Court and violating a Court order). Given the possibility of a disbarment sanction, it is probable that the Board did consider this information in determining its sanction. In any event, Figliola's contention in this regard is not credible.

■ More generally, CSTF's efforts to assist lawyers should not be considered as absolving lawyers of the duty to read and follow Interpretive Guideline No. 2,[11] which provides for the preservation of funds and property of clients. Compliance checks performed at CSTF's direction are not audits and are not intended to verify the correctness of entries in an attorney's books and records. Accepting Figliola's claim that CSTF's failure to inform him of his unethical behavior cloaked his actions in legitimacy would place upon compliance agencies the insupportable burden of constantly policing lawyers and then providing them with an advisory opinion as to their conduct.

## B. Client Advances

■ Figliola next claims that the Board erred in failing to consider the client advances in excess of the $6,000 for which he was credited.[12] These are important, he argues, because they show: (1) that the ratio of disbursements to advances was not as great as it seemed; (2) that he did not try to damage Facciolo financially; and (3) that Facciolo suffered no monetary loss. This contention similarly lacks merit.

First, the ratio of personal disbursements to client advances was only one of several factors that the Board considered in calculating Figliola's level of culpability. *See* Respondent's Appendix at 103–110, *In re Figliola,* slip op. at 1–8. Second, Figliola's contentions that he did not mean to harm, and in fact did not harm, Facciolo are irrelevant. Figliola could not prove that the $6,000 he paid out of his drawing account, for which he was not granted credit, was for legitimate Firm business. In light of this fact, the Board could not consider this as an appropriate advancement. Figliola counters that the drawing account was used in support of his tax preparation business, and since this business required little or no cost advancements, all advancements must have been for Firm clients. This conclusion is not credible and does not flow logically from Figliola's argument. Although the tax preparation business required few cost advancements, it is possible that Figliola removed the funds in that account for personal reasons. Figliola's claim, while suggesting that the funds were not removed for tax preparation purposes, does not support his contention that the funds must have been removed for Firm purposes.

## C. Father-in-Law's Affidavit

Figliola also contends that the Board failed to consider his father-in-law's affidavit. The affidavit states that Figliola's father-in-law asked Figliola to remove funds from the escrow account and place them in Figliola's personal account. The affidavit does not state why Figliola's father-in-law requested this. Figliola himself stated that the request was made so his father-in-law could earn interest. There does not appear to be an error in the Board's decision, which is based on Figliola's own testimony, that he violated DLRPC 1.15(d) by failing to place his father-in-law's funds in an interest-bearing account.

---

**11.** Interpretive Guideline No. 2 provides, in part, that attorneys shall maintain books and records in accordance with generally accepted accounting principles, and shall make their books available to any firm directed by the CSTF to verify the accuracy thereof.

**12.** Figliola contends that the actual amount of client advances he made was approximately $12,000. Since he could document only $6,000 of that amount, he was credited only for that part.

## D. Use of Young's Funds

 Finally, Figliola contends that the Board should have considered the fact that Figliola always had sufficient funds to cover his use of Young's funds. Figliola concentrates on the wrong issue, however. The issue is not whether Figliola could have adequately reimbursed Young. Rather, the issue is whether Figliola should have taken a client's money without proper authorization.

The New Jersey Supreme Court's holding in *In re Librizzi,* 117 N.J. 481, 569 A.2d 257, 261 (1990), is instructive with regard to this point.

> [Knowing misappropriation] consists simply of a lawyer taking a client's money and knowing that the client had not authorized the taking. It makes no difference ... whether the attorney intended to return the money when he took it, or whether in fact he ultimately did reimburse the client.... [T]he relative moral quality of the act, measured by these many circumstances that may surround both it and the attorney's state of mind, is irrelevant.

(emphasis omitted). The Board's recommendation that Figliola be suspended for thirty days (when the maximum sanction for knowing or reckless misappropriation of funds is disbarment) indicates that the Board considered at least some of the factors during its deliberation. On this record, however, we view the misappropriation as a breach of trust necessitating more than a token suspension.

## III. APPROPRIATENESS OF SANCTION

Figliola claims that, regardless of the Board's consideration of the aforementioned circumstances, the recommended sanction was too severe. Given his lack of prior disciplinary record, his willing cooperation with the ODC and his complete restitution of the funds taken, Figliola asserts that he was entitled to a milder sanction than the thirty-day suspension imposed. We have concluded quite the opposite: The Board's recommended sanction was too lenient and was impracticable.

## A. Discretion of this Court

 This Court has exclusive authority and wide latitude in determining disciplinary sanctions over lawyers. *In re Agostini,* Del. Supr., 632 A.2d 80, 81 (1993). Each case is fact sensitive, *In re Tos,* Del.Supr., 610 A.2d 1370, 1372 (1992), and the Board's legal conclusions are reviewed *de novo, Id.; In re Barrett,* Del.Supr., 630 A.2d 652, 656 (1993). It is the ultimate responsibility of this Court to impose sanctions. The Board often recommends sanctions for the Court's consideration, but this Court is not bound thereby. "In determining an appropriate sanction, this Court must 'protect the interests of the public and the [B]ar while giving due consideration to the interests of the individual involved.'" *Id.* (citation omitted); *see also ABA Standards for Imposing Lawyer Sanctions,* Preface (1991), (hereinafter *"ABA Standards"*) (listing such relevant policy considerations as "protecting the public, ensuring the administration of justice, and maintaining the integrity of the profession").

 The primary purpose of disciplinary proceedings is "to protect the public; to foster public confidence in the Bar; to preserve the integrity of the profession; and to deter other lawyers from similar misconduct." *Agostini,* 632 A.2d at 81. The lawyer discipline system is not penal or punitive in nature. *See, e.g., In re Christie,* Del.Supr., 574 A.2d 845, 851 (1990); *In re Rich,* Del.Supr., 559 A.2d 1251, 1257 (1989); *In re Bennethum,* Del.Supr., 161 A.2d 229, 236 (1960).

 In determining the appropriate sanction, the Court considers four factors: (i) the nature of the duty violated; (ii) the attorney's mental state; (iii) the actual or potential injury caused by the misconduct; and (iv) the existence of aggravating and mitigating circumstances. *See Agostini,* 632 A.2d at 81 n. 2 (citing *ABA Standard* 3.0). The Court has looked to its own precedents and has cited favorably the guidelines set forth in the *ABA Standards. Id.*

## B. Precedent

 Sanctions resulting from the misappropriation of a client's property have varied. Disbarment is appropriate in cases of inten-

tional and felonious misappropriation. *In re Higgins,* Del.Supr., 582 A.2d 929 (1990). Suspension is appropriate in cases of knowing misappropriation. Bd.Prof.Resp.R. 8(a)(2); *In re Barrett,* Del.Supr., 630 A.2d 652 (1993); *In re Frabizzio,* Del.Supr., 498 A.2d 1076 (1985). Public reprimand and/or a fine is appropriate in instances of negligence. *In re Reed,* Del.Supr., 369 A.2d 686 (1977); *In re Green,* Del.Supr., 331 A.2d 145 (1975).

In *Higgins,* the Court disbarred Higgins for (i) feloniously converting client funds that were supposed to be used to satisfy various clients' tax, fee and mortgage obligations, and (ii) failing to maintain financial journals, ledgers and reconciliations. *See also Barrett,* 630 A.2d 652 (imposing three year sanction on retired lawyer who was responsible for the loss of a minor client's funds by his negligent failure to preserve funds in a separate account); *Frabizzio,* 498 A.2d 1076 (imposing two-year suspension on lawyer who knowingly distributed one settlement sheet to real property sellers while distributing a different sheet to the other participants in the transaction).

On the other hand, the Court imposed a public censure and a $5,000 fine on the attorney in *Reed,* due to the fact that the Court found that Reed had violated DR 9–102 (the precursor to DLRPC 1.15). Although no loss occurred, Reed made three disbursements from his real estate escrow account on behalf of clients who had not deposited with him sums to cover such disbursements. And in *Green,* poorly kept records and books resulted in commingling of client funds with firm funds. Since no one suffered any losses and Green rectified the problem, the Court ordered a public censure and a fine of $2,500.

Figliola's misappropriation of Firm and client funds, considered together with his return of the funds, falls somewhere in between the extremes of *Higgins* and *Green.* Although Figliola recklessly misused Firm funds, knowingly misused client funds and by doing so violated the fiduciary duty he owed his clients, he did not exhibit the wanton conduct exhibited in *Higgins, Barrett* and *Frabizzio.* Additionally, as the Board noted in its consideration of aggravating and mitigating circumstances, Figliola has no prior

record of unethical behavior, replaced all funds improperly removed, and cooperated fully with the investigating bodies.

Given these facts, the Board correctly concluded that the most appropriate sanction is suspension. *See ABA Standards* Standard 4.12 (providing that "suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client").

Figliola claims that *ABA Standard* 4.13, which provides for reprimand, is more appropriate in this case than 4.12. This is not the case, however, given that 4.13 "should be reserved for lawyers who are merely negligent in dealing with client property.... Suspension ... [is] appropriate for lawyers who are grossly negligent." *ABA Standards,* Standard 4.13, commentary.

■■■ Having determined that suspension is the most appropriate sanction in this case, the inquiry turns to the length of suspension required. The Board recommended that Figliola be suspended for a period not to exceed thirty days. The *ABA Standards* state, however, that suspensions generally should be for at least six months; short-term suspensions serve as fines and are not favored. *ABA Standards,* Standard 2.3. We have concluded, independent of the ABA position on suspensions, that a short-term suspension of the type recommended by the Board is too lenient. Moreover, it would be impracticable to institute, monitor and satisfy. Any lawyer who is suspended from the practice of law needs adequate time to notify clients, make arrangements for cases currently in progress to be handled professionally to the clients' satisfaction, tidy up financial dealings, and remove oneself totally from the practice of law. It is simply not practicable to do this within a thirty-day time period.

■■■ This Court has determined that Figliola's knowing and reckless misappropriation of Firm and client funds is a serious infraction of the DLRPC. Consideration of the misconduct and the various policy goals involved lead to the conclusion that Figliola deserves a strong sanction. Although we do not regard this as a self-reporting case be-

cause Facciolo uncovered Figliola's misconduct, the Court's decision that a strong sanction is required is tempered somewhat by the Board's finding of mitigating factors—namely, Figliola's lack of prior disciplinary record, repayment of monies taken and full cooperation with the ODC. Accordingly, this Court imposes upon Figliola a six month and one day suspension from the practice of law.[13]

Reinstatement after this period will be allowed only upon a "produc[tion] of clear and convincing evidence of professional rehabilitation, fitness to practice law, and competence," *In re Reed*, Del.Supr., 584 A.2d 1207, 1209 (1990) (interpreting Rule 23 of Rules of Board on Professional Responsibility) (emphasis omitted), as well as a showing "that the resumption of the practice of law within Delaware will not be detrimental to the administration of justice[,]" Bd.Prof.Resp.R. 23(f). The Court adopts the conditions for reinstatement imposed by the Board and additional conditions calculated to show a sensitivity to client and Firm responsibilities and the handling of financial affairs.

Should Figliola be unsuccessful upon his first attempt at reinstatement, he may reapply. *See In re Clark*, Del.Supr., 406 A.2d 28 (1979) (denying disbarred lawyer's first petition for reinstatement); *In re Clark*, Del. Supr., 430 A.2d 1082 (1981) (denying second petition); *In re Clark*, Del.Supr., No. 170, 1984, McNeilly, J. (Sept. 24, 1984) (ORDER) (denying third petition); *In re Clark*, Del. Supr., 607 A.2d 1230, 1236–37 (1992) (granting fourth petition, but only upon satisfaction of enumerated conditions); *see also In re Bennethum*, Del.Supr., 278 A.2d 831, 832, 834 (1971) (granting disbarred lawyer's third petition for reinstatement).

## IV. CONCLUSION

We have carefully considered the record in this case, as well as the Board's Report. Although the Board recommended a sanction of thirty days, we have determined that the interests of the public, the Bar and Figliola

would all be served if, as a result of Figliola's misappropriation of funds and failure to keep accurate records, he is suspended prospectively for a period of six months and one day. *Accord, ABA Standards*, Standard 4.12.

Accordingly, IT IS ADJUDGED and ORDERED that Figliola be disciplined as follows:

1. That Figliola be prohibited and suspended from engaging in the practice of law as a member of the Delaware Bar commencing April 1, 1995.

2. Figliola may apply for reinstatement on or after October 2, 1995 by filing a petition for reinstatement with the Board and may be reinstated thereafter if he shows to the satisfaction of the Board that he has satisfied the conditions set forth herein for reinstatement.

3. Upon the Board's certification to the Court that Figliola has satisfied the conditions, the Court may enter an order of reinstatement.

4. The petition for reinstatement shall be expedited by the Board and the Court.

5. During the suspension period, Figliola shall not (a) share in any legal fees arising from clients or cases referred by him, during the period of suspension, to any other attorney, or (b) share in any legal fees earned for services by others during such period of suspension.

6. Figliola shall either cease using his WSFS drawing account in connection with Firm business or cause the account to comply with DLRPC 1.15(d).

7. Figliola shall cause the name of his Firm's real estate account to be changed to reflect its fiduciary nature.

8. Figliola shall attend appropriate academic and continuing legal education courses in legal ethics and the handling of financial accounts during the suspension period so that (a) such courses shall aggregate at least

---

13. We have determined that a six month and one day suspension, rather than a six month suspension, is the appropriate sanction in this instance. This is because Rule 23(a) of the Rules of the Board on Professional Responsibility provides that a showing of rehabilitation is necessary for reinstatement from suspension only if the suspension is for a period longer than six months. Given the seriousness of Figliola's violations, we feel a showing of rehabilitation is necessary before Figliola can be reinstated to the Delaware Bar.

50 hours of certified credit by a responsible institution or institutions and that (b) such courses and the level of Figliola's learning therefrom shall be qualitatively and quantitatively satisfactory to the Board.

9. Pursuant to Board on Professional Responsibility Rule 23(h), Figliola shall pay all costs of this proceeding, such costs to be assessed by the Board.

This Opinion is to be disseminated by Disciplinary Counsel in accordance with Rules 3 and 14 of the Rules of the Board on Professional Responsibility.