**In the Matter of a Member of the Bar of the Supreme Court of the State of Delaware John E. O'BRIEN, Respondent.**

**No. 139, 2011.**

Supreme Court of Delaware.

Submitted: June 15, 2011.
Decided: July 20, 2011.

204 ■

Frederick W. Iobst, Esquire, Chief Disciplinary Counsel, Wilmington, Delaware.

Charles Slanina, Esquire, Finger & Slanina, LLC, Hockessin, Delaware, for John E. O'Brien.

Before STEELE, Chief Justice, HOLLAND and RIDGELY, Justices.

PER CURIAM:

This is a lawyer disciplinary proceeding, which addresses charges of professional misconduct against John E. O'Brien ("O'Brien" or the "Respondent"). O'Brien was charged with several violations of the Delaware Lawyers' Rules of Professional Conduct (the "Rules"). A Panel of the Board on Professional Responsibility (the "Board") concluded that O'Brien violated several Rules and recommended a 120–day suspension, followed by an eighteen-month period of probation. O'Brien filed objections to the Board's findings and recommendation. The Office of Disciplinary Counsel (the "ODC") filed objections to the Board's recommendation on sanctions.

This Court has considered the matter carefully. We have concluded that O'Brien should be suspended from practicing law for three months. We agree with the Board's recommendation of an eighteen-month period of probation with conditions. That probationary period will begin after O'Brien has been reinstated following his suspension.

### Facts and Procedural History

O'Brien was admitted to the Delaware Bar approximately thirty-two years ago. In 2003 and 2004, O'Brien had an ongoing lawyer-client relationship with James Tennefoss and several business entities that Tennefoss controlled, including Delmar Homes. During the period from 2000 through 2003, O'Brien handled approximately one hundred to one hundred and fifty settlements that involved Delmar Homes and other related businesses. O'Brien was also Delmar Homes' incorporator, was the first director identified in its certificate of incorporation, and has served as its registered agent since the time of its incorporation.

In 2003, Wynell Ebaugh and O'Brien discussed financial problems that Ebaugh was experiencing with two residential properties. O'Brien referred Ebaugh to Tennefoss to determine whether Tennefoss was interested in purchasing one of those properties. Ebaugh and Tennefoss did not reach a sales agreement, but Tennefoss agreed to loan $26,000 to Ebaugh, with the property serving as collateral. Tennefoss then contacted a private lender, Fulton Jeffers, who agreed to provide Delmar Homes with $26,000 to lend to Ebaugh, with an assignment of the mortgage and note to a Jeffers family member. Delmar Homes agreed to guarantee the debt for Jeffers.

At the closing of the loan, O'Brien charged Ebaugh $900 for legal services. An additional $1,500 also was withheld from the loan proceeds. The closing document identified this amount as an additional settlement charge with the description, "Chancery Court Case." The $1,500 that was withheld was deposited in the operational account of O'Brien's law firm, not the law firm's trust account. The Board found that O'Brien did not enter into a fee agreement with Ebaugh regarding the unrelated "Chancery Matter" and did not do any substantive work on that matter.

*Count 1: O'Brien represented a client when he had a conflict of interest based upon his concurrent relationship with another*

The Board found that O'Brien had an ongoing relationship with Tennefoss and

Delmar Homes during the time he represented Ebaugh. The Board also found that there was a significant risk that O'Brien's representation of Ebaugh was materially limited by his responsibilities to Tennefoss and Delmar Homes. The Board found that O'Brien did not obtain the informed consent of the parties to engage in the representation given the conflict of interest. In accordance with those findings, the Board concluded that O'Brien violated Rule 1.7(a).[1]

*Count 2: O'Brien represented a client when he had a conflict of interest based on his personal interest*

The Board found that O'Brien had a personal interest in the loan transaction because his roles as officer, director, and registered agent of Delmar Homes "gave him a personal interest (fiduciary duties) that conflicted with his duties to [ ] Ebaugh." The Board rejected O'Brien's argument that he served those roles in a "ministerial capacity" and explained that O'Brien "should have known that it wasn't quite so simple." In accordance with those findings, the Board concluded that O'Brien violated Rule 1.7(a).[2]

*Count 6: O'Brien failed to safeguard client funds*

The Board found that the $1,500 that was withheld from the loan proceeds was not a charge for fee earned but a retainer for work to be performed. The Board also found that the $1,500 was deposited in the operational account of O'Brien's law firm, not the law firm's trust account. In accordance with those findings, the Board concluded that O'Brien violated Rule 1.15(a).[3]

*Count 8: O'Brien failed to comply with his obligations relating to advance fees*

With the respect to the "advance fee" in the amount of $1,500, the Board found that O'Brien did not provide Ebaugh with a written statement that documented the basis for his legal fees, either prospectively or retrospectively. In accordance with those findings, the Board concluded that O'Brien violated Rule 1.5(f).[4]

---

1. Rule 1.7 provides:
   (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
   (1) the representation of one client will be directly adverse to another client; or
   (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
   (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
   (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
   (2) the representation is not prohibited by law;
   (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
   (4) each affected client gives informed consent, confirmed in writing.

2. *Id.*

3. Rule 1.15(a) relevantly provides: "A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property...."

4. Rule 1.5(f) provides:
   A lawyer may require the client to pay some or all of the fee in advance of the lawyer undertaking the representation, provided that:
   (1) The lawyer shall provide the client with a written statement that the fee is refundable if it is not earned,
   (2) The written statement shall state the basis under which the fees shall be considered to have been earned, whether in whole or in part, and

*Count 10: O'Brien failed to protect his client's interests upon termination of the representation*

The Board found that O'Brien was in possession of his client's property (Ebaugh's $1,500) at the conclusion of their representation. The Board determined that when O'Brien became aware that Ebaugh would no longer require his services, O'Brien was required to return the $1,500 in unearned fees. The Board found that O'Brien did not return that money to Ebaugh until after these disciplinary proceedings were initiated. In accordance with those findings, the Board concluded that O'Brien violated Rule 1.16(d).[5]

*Counts 3, 4, 5, 7, 9, 11*

The Board found that the Office of Disciplinary Counsel had failed to establish by clear and convincing evidence that O'Brien had violated the Rules as alleged in Counts 3, 4, 5, 7, 9, and 11. The ODC has not challenged the Board's determination in that respect.

### Board Recommendation on Sanctions [6]

In making its recommendation to this Court, the Board utilized the four-part framework set forth in the ABA Standards for Imposing Lawyer Sanctions (the "ABA Standards") as discussed in *In re Steiner*.[7] A preliminary determination of the appropriate sanction is made by assessing the first three parts of that framework: first, the ethical duty violated; second, the lawyer's state of mind; and third, the actual or potential injury caused by the lawyer's misconduct.[8] Once the preliminary determination is made, the fourth part addresses whether an increase or decrease in the preliminarily determined sanction is justified because of the presence of aggravating or mitigating factors.[9]

First, regarding the ethical duties violated, the Board noted that all five violations—two involving conflict of interest and three involving handling of client funds—occurred in connection with a single closing on a loan secured by real estate. Second, regarding O'Brien's state of mind, the Board concluded that all of O'Brien's violations were "knowing." Third, regarding injury caused by O'Brien's misconduct, the Board stressed that there was "significant potential for injury." Based on those considerations, the Board determined that a suspension was the presumptive sanction under the ABA Standards.

Under the fourth part of the ABA Standards, the Board addressed the aggravating and mitigating factors in O'Brien's case. The Board found two mitigating factors: first, in satisfying Ebaugh's $26,000 mortgage, O'Brien "went far beyond his obligations," and second, O'Brien did not act intentionally for the purpose of self enrichment or selfish motives. How-

---

(3) All unearned fees shall be retained in the lawyer's trust account, with statement of the fees earned provided to the client at the time such funds are withdrawn from the trust account.

5. Rule 1.16(d) relevantly provides:
Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred....

6. This section is based on the Panel's March 21, 2011 Report and Recommendation on Sanctions.

7. *In re Steiner*, 817 A.2d 793, 796 (Del.2003).

8. *Id.*

9. *Id.*

ever, the Board also found several aggravating factors.

The Board was concerned with O'Brien's actions given his substantial experience, as well as O'Brien's prior violations. On July 17, 1989, this Court imposed a Public Reprimand on the Respondent for failing to pay Federal FICA taxes and state income taxes from wages of employees. On November 22, 2005, this Court again imposed a Public Reprimand on the Respondent for (a) his failure to supervise a non-lawyer assistant which resulted in the theft of $94,000 from the firm escrow account; (b) an unidentified overage of $9,297 confirmed by an audit in violation of Rule 1.15(a); (c) failing to maintain his books and records in compliance with the rules; and (d) making false representations to this Court in his Certificate of Compliance regarding the status of his books and records.

The Board noted that Ebaugh was vulnerable. In addition, the Board was concerned with O'Brien's "casual, careless approach that infected his responses to ODC and his testimony before the Panel." Nevertheless, the Board concluded that the aggravating factors did not sufficiently outweigh the mitigating factors so as to warrant any change from the presumptive sanction of a suspension under the ABA Standards.

The Board provided this Court with the following recommended sanction:

The ODC recommended that the Respondent be suspended for a period of twelve months. Upon reviewing the cases cited by ODC, the Panel observes that the Court has imposed sanctions of various lengths for violations under a variety of similar but not identical matters. The Panel is mindful that the violations arose out of a single transaction and in large part resulted from Respondent's failure to follow his own procedures and other good practices that are commonly employed in the private bar. After careful consideration of the facts and circumstances, the Panel recommends a 120 day suspension, to be followed by an 18 month period of probation with terms designed to prevent future risk of harm to the public.

The Board also recommended that this Court impose the following conditions on O'Brien's probation:

(a) Respondent consult with an attorney, approved by ODC, to establish appropriate procedures for documenting initial retention by the client (including nature and scope of the retention and all fee arrangements), recording time, billing for services, checking for conflicts, obtaining and documenting waivers and documenting money received from or on behalf of clients, closing matters and documentation to memorialize other significant stages in the lawyer-client relationship.

(b) Upon adoption of the procedures by Respondent or expiration of the 120 day suspension period, whichever occurs later, Respondent's probation would continue for an additional eighteen months. During this period, Respondent will be under the supervision of an attorney, approved by the ODC, who will ensure that [R]espondent is following the procedures he established.

### Standard of Review

■ This Court has the "inherent and exclusive authority to discipline members of the Delaware Bar."[10] Our role is to

---

**10.** *In re Abbott,* 925 A.2d 482, 484 (Del.2007) (quoting *In re Froelich,* 838 A.2d 1117, 1120   (Del.2003)).

review the record independently and determine whether there is substantial evidence to support the Board's factual findings.[11] We review the Board's conclusions of law *de novo*.[12] Although the sanction recommendations of the Board are helpful, we are not bound by those recommendations.[13]

### Record Supports Board's Findings

■ O'Brien argues that the Board erroneously found that he had a conflict of interest and that the $1,500 was not an earned fee. O'Brien also argues that the Board erred in resolving credibility issues between Ebaugh and O'Brien. O'Brien's arguments regarding the Board's factual findings are without merit, however, because the record reflects that there was substantial evidence to support those factual findings.

The Board properly concluded "there is no question in the evidence on the record that the Respondent knew the facts that triggered his ethical obligations under Rule 1.7." The Respondent knew that he had a significant relationship with Tennefoss at the time of the Ebaugh transaction. The Respondent knew that the Tennefoss real estate work [14] was a significant part of his real estate practice at this time.[15] In addition to real estate closings, he had performed corporate work for Tennefoss: forming legal entities, serving as registered agent and serving as an officer for those entities. He had worked on tax and environmental matters for the Tennefoss corporations.

O'Brien knew he had represented Tennefoss and his corporations in the past and was representing them to a significant degree at the time of the transaction with Ebaugh. The Board found that, with O'Brien's legal assistance, Ebaugh agreed to a loan from another O'Brien client, Delmar Homes with unfavorable terms with the stated intent to use the proceeds to repair a rental property and then sell that property to pay off the loan. The loan was a high interest rate, interest only loan with a one-year balloon and very high fees.

The Respondent is deemed to know the requirements of Rule 1.7. Nevertheless, O'Brien testified that he did not "feel conflicted." Rule 1.7(a) is an objective standard and does not rely upon the lawyer's subjective belief about his ability to remain impartial. It states that there is a conflict if (1) "the representation of one client will be directly adverse to another client" or (2) "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client ... or the personal interest of the lawyer." The record supports the Board's finding that O'Brien had a conflict of interest in concurrently representing both Ebaugh and the Tennefoss corporation, Delmar Homes.

■ The Board also found that O'Brien charged Ebaugh at the loan closing with Delmar Homes for work he had not yet performed on the unrelated "Chancery Court Case." The record reflects that O'Brien did not enter a fee agreement with his client, which would have evidenced her agreement to this arrangement, that he

11. *Id.*

12. *Id.*

13. *Id.*

14. The Respondent had conducted between 100 and 150 settlements for Tennefoss and his various companies over a several year period, beginning before the Ebaugh transaction and ending after it.

15. The Respondent testified that he held between 3 and 5 settlements a week (156 to 260 per year) during this time.

failed to put the money in an escrow account, and that he did not promptly return the money when the representation terminated. The record also reflects that O'Brien provided no statement of account at the time of the loan closing to explain the work he performed and how the charge was calculated.

O'Brien testified that his missing file would have contained a fee agreement and his time would have been recorded and submitted when the time was billed. The record reflects that when the file was found it did not contain the predicted documents. In addition, the records of O'Brien's firm had no time entries, billing records, documents that showed work performed or other evidence that would suggest that the charge was for work performed. After considering O'Brien's somewhat inconsistent testimony and considering the documents that were introduced into the record, the Board found that the $1,500 fee charged to Ebaugh was not for work performed. That finding is supported by the record.

### Board's Sanction Recommendation

■ O'Brien argues that the Board's recommended sanction is not supported by the record or the prior precedents of this Court. O'Brien contends that an admonition or reprimand is the appropriate sanction under this Court's precedents and the ABA Standards. The ODC argues that this Court's precedents and the ABA Standards require a sanction of suspension from the practice of law for no less than twelve months.

We hold that the Board correctly determined that the presumptive sanction under the ABA Standards for O'Brien's knowing violations is a suspension.[16] We agree with the Board's determination that, although the aggravating factors outweigh the mitigating factors, a change from the presumptive sanction is not justified in this case. Consequently, the length of the suspension term is the only question to be decided. The ODC requested, and still argues for, a twelve month suspension. The Board recommended a 120 day suspension.

The ODC argues that a suspension period of at least six months is required by ABA Standard 2.3, which provides (emphasis added):

Suspension is the removal of a lawyer from the practice of law for a specified minimum period of time. *Generally, suspension should be for a period of time equal to or greater than six months,* but in no event should the time period prior to application for reinstatement be more than three years. Procedures should be established to allow a suspended lawyer to apply for reinstatement, but a lawyer who has been suspended should not be permitted to return to practice until he has completed a reinstatement process demonstrating rehabilitation and fitness to practice law.

The word "generally" allows for a case by case determination. The commentary to that section supports such an approach.[17] In the past, this Court has noted that a suspension of thirty days is too

---

**16.** *See* ABA Standards 4.12 ("Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.") and 4.32 ("Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.").

**17.** Commentary to ABA Standard 2.3 ("The specific period of time for the suspension should be determined after examining any aggravating or mitigating factors in the case.").

brief,[18] and that the six month suggestion in ABA Standard 2.3 only serves as a guide.[19]

■ The ODC argues that this Court's prior cases support a period of suspension of twelve months, or at least a period greater than six months. The ODC cites to several of our cases for that proposition.[20] This Court's prior precedents demonstrate that the Court determines the appropriate length of a period of suspension after a careful review of the facts and circumstances of each case. In the past, we also have imposed suspensions with a term less than six months.[21]

The record reflects that O'Brien referred his new client, Ebaugh, to Tennefoss, who was a current and long-time personal and corporate client. Despite this inherent and obvious conflict, O'Brien concurrently represented both of their interests without obtaining the proper waivers and consents. The record also reflects that O'Brien took an unearned fee from Ebaugh in an unrelated matter.

O'Brien has been publicly reprimanded on two prior occasions. Notwithstanding those prior sanctions, the facts in the present proceeding reflect that O'Brien has not focused on his ethical duties, and in this case testified that he did not "feel conflicted." That lack of focus has been exacerbated by O'Brien's continued failure to properly administer his law practice, notwithstanding the nature of his two prior public reprimands.

We have carefully considered the ethical violations, the nature of the violations, the aggravating and mitigating factors, and all of the facts and circumstances of this case. We have concluded that a suspension of three months, followed by an eighteen-month period of probation with conditions is appropriate.

### Conclusion

Now, therefore, it is hereby ordered that:

1. The Respondent shall be prohibited and suspended from engaging in the practice of law for a period of three months. The suspension will commence on August 1, 2011 and end on November 1, 2011.

2. Beginning on November 2, 2011, the Respondent is placed on probation for a period of eighteen months, during which

---

18. See Matter of Figliola, 652 A.2d 1071, 1077 (Del.1995) ("Any lawyer who is suspended from the practice of law needs adequate time to notify clients, make arrangements for cases currently in progress to be handled professionally to the clients' satisfaction, tidy up financial dealings, and remove oneself totally from the practice of law. It is simply not practicable to do this within a thirty-day time period.").

19. See id. ("We have concluded, independent of the ABA position on suspensions, that a short-term suspension of the type recommended by the Board is too lenient.").

20. In re Davis, 974 A.2d 170 (Del.2009) (imposing one year suspension on lawyer who knowingly failed to pay transfer taxes due on real estate transactions and had documents falsely notarized); In re Wilson, 900 A.2d 102, 2006 WL 1291349 (Del.2006) (TABLE) (imposing eighteen month suspension on lawyer who delayed probate of over twenty estates); In re Bailey, 821 A.2d 851 (Del.2003) (imposing six month suspension on lawyer who knowingly failed to discharge his responsibilities as managing partner); In re Steiner, 817 A.2d 793 (Del.2003) (imposing three year suspension on lawyer who was convicted of driving under the influence and two counts of vehicular assault); Matter of Figliola, 652 A.2d 1071 (Del.1995) (imposing six month and one day suspension on lawyer who misappropriated firm and client funds).

21. See, e.g., In re Katz, 981 A.2d 1133 (Del. 2009) (imposing a three month suspension on lawyer who failed to disclose conflict of interest to clients).

time the following conditions shall be imposed:

(a) The Respondent shall consult with an attorney, approved by ODC, to establish appropriate procedures for documenting initial retention by the client (including nature and scope of the retention and all fee arrangements), recording time, billing for services, checking for conflicts, obtaining and documenting waivers and documenting money received from or on behalf of clients, closing matters and documentation to memorialize other significant stages in the lawyer-client relationship.

(b) During the probationary period, the Respondent will be under the supervision of an attorney, approved by the ODC, who will ensure that the Respondent is following the foregoing procedures that he established.

(c) Upon the completion of the probationary period, at the Respondent's cost, the Respondent's books and records will be audited by a person approved by ODC to determine compliance with the procedures. The auditor will report his findings to ODC. Any material failure to follow the procedures the Respondent has adopted may be found to be a violation of probation.

3. During the suspension, the Respondent shall conduct no act directly or indirectly constituting the practice of law, including the sharing or receipt of any legal fees. The Respondent shall also be prohibited from having any contact with clients or prospective clients or witnesses or prospective witnesses when acting as a paralegal, legal assistant, or law clerk under the supervision of a member of the Delaware Bar, or otherwise.

4. The Office of Disciplinary Counsel shall file a petition in the Court of Chancery for the appointment of a receiver for the Respondent's law practice.

5. The Respondent shall assist the Receiver in following the directives of Rules 21 and 23 of the Delaware Lawyers' Rules of Disciplinary Procedure.

6. The Respondent shall make such arrangements as may be necessary to protect the interests of any of the Respondent's clients.

7. The Respondent shall pay the costs of these disciplinary proceedings, pursuant to Rule 27 of the Delaware Lawyers' Rules of Disciplinary Procedure, promptly upon presentation of a statement of costs by the ODC.

8. The Respondent shall fully cooperate with the ODC in its efforts to monitor his compliance with this Opinion.

9. This Opinion shall be disseminated by the ODC in accordance with Rule 14 of the Delaware Lawyers' Rules of Disciplinary Procedure.