**In the Matter of a Member of the Bar of the Supreme Court of Delaware Joel D. TENENBAUM, Respondent.**

No. 565, 2006.

Supreme Court of Delaware.

Submitted: Dec. 13, 2006.
Decided: Feb. 6, 2007.

Jeffrey M. Weiner, Esquire, Wilmington, Delaware, for respondent, Joel D. Tenenbaum.

Andrea L. Rocanelli, Esquire, Office of Disciplinary Counsel, Wilmington, Delaware.

Before HOLLAND, BERGER and JACOBS, Justices.

PER CURIAM.

This is an attorney disciplinary matter involving charges of professional misconduct filed against Joel D. Tenenbaum, the Respondent. Tenenbaum is currently suspended from the practice of law for three years following this Court's order of August 5, 2005.[1] The Petition for Discipline

at issue in this proceeding was filed by the Office of Disciplinary Counsel (the "ODC"). It alleges the following three counts of illegal conduct involving moral turpitude: (1) Indecent Exposure; (2) Sexual Assault; and (3) Unlawful Imprisonment. In a Report dated May 8, 2006 (the "Violation Report"),[2] the Board on Professional Responsibility (the "Board) found that the foregoing allegations of illegal conduct involving moral turpitude had been established by clear and convincing evidence. In this opinion, we affirm the findings of facts and conclusions of law in the Board's Violation Report.

In a Report dated October 16, 2006 (the "Discipline Report"),[3] the Board recommended that Tenenbaum be disbarred. We have made an independent determination that the sanction recommended in the Board's Discipline Report is appropriate. Accordingly, we have decided that Tenenbaum must be disbarred.

### Petition for Discipline

The current Petition for Discipline alleges that, in or about 1983, Tenenbaum engaged in illegal conduct involving moral turpitude. The relevant portion of the then applicable code of professional conduct is DR 1–102(A)(3), which prohibited illegal conduct involving moral turpitude.[4] The allegations in the Petition are based entirely upon the complaints of Carolyn Catts,[5] a former client of Tenenbaum. She alleges that Tenenbaum sexually assaulted her during an after-hours meeting at his law office in the Independence Mall. At the

---

1. *In re Tenenbaum*, 880 A.2d 1025 (Del.2005).

2. Appendix I.

3. Appendix II.

4. Rule 8.4(b) of the Delaware Lawyers' Rules of Professional Conduct is the substantial equivalent of DR 1–102(A)(3) and provides

"[a] lawyer shall not commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects."

5. Carolyn Catts is a pseudonym for Respondent's former client, the complaining witness in this case.

time of the alleged assault, Ms. Catts was in her early twenties.

### Laches Defenses

Tenenbaum admits "upon information and belief" that he represented Carolyn Catts, as her defense attorney, in connection with a charge of "driving while under the influence" in or about 1983. Otherwise, Tenenbaum states he has no specific recollection of Catts or his representation of her. Tenenbaum denies all of the alleged acts of illegal conduct. Tenenbaum also raises the affirmative defenses of laches and violation of due process, *i.e.,* that the delay in prosecution of the disciplinary charges against him for more than twenty-two years constitutes actual prejudice. In support of his laches defense, Tenenbaum asserts that:

1. His file in connection with any representation of Ms. Catts was destroyed by the firm in due course approximately 7–10 years after the conclusion of the representation;

2. His time records in connection with Ms. Catts were destroyed by the firm in due course approximately seven to ten years after the conclusion of representation;

3. Any alleged furniture referenced by Ms. Catts in her complaint has not been in the possession, custody and/or control of Tenenbaum since Tenenbaum's firm moved from the Independence Mall to 3200 Concord Pike approximately 13 years ago

4. Tenenbaum's secretary died in June, 2002 and thus is unavailable as a witness;

5. Tenenbaum has no recollection of Ms. Catts and/or of his representation of her after the passage of 22 years; and

6. Ms. Catts destroyed documents pertaining to this matter several months prior to lodging her complaint with the ODC.

### Board's Violation Report

The Board identified the two issues before it at the violation hearing as follows:

*Issue 1.* Did the ODC establish by clear and convincing evidence that Respondent engaged in illegal conduct involving moral turpitude, in violation of the then applicable DR 1–102(a)(3) of the Code of Professional Responsibility?

*Issue 2.* If the ODC established by clear and convincing evidence that Respondent engaged in illegal conduct involving moral turpitude, in violation of the then applicable DR 1–102(a)(3) of the Code of Professional Responsibility, should the Board nonetheless dismiss the case because of the delay of more than 22 years in the prosecution of disciplinary charges against him?

The Board answered those two inquiries, as follows:

*Board Findings–Issue 1.* The Board finds that the record established at the hearing demonstrates the Respondent engaged in illegal conduct involving moral turpitude, in violation of the then applicable DR 1–102(a)(3) of the Code of Professional Responsibility, and that ODC met its burden of proving the charged misconduct by clear and convincing evidence, as required by the Delaware Lawyers' Rules of Disciplinary Procedure ("Procedural Rules"), Rule 15(c) (standard of proof) and Rule 15(d) (burden of proof).

*Board Findings–Issue 2.* The Board finds that the public interests at issue and the standards limiting laches defenses set forth in the *Kotler* and *Bash* cases are as applicable to lawyer disciplinary proceedings as they are to physician disciplinary proceedings. The Board finds that Respondent did not meet his burden of proving both that the delay in the initiation of disciplinary proceedings was unreasonable, and that prejudice resulted from the delay. The Board finds that Ms. Catts' reporting

of the assault nearly 22 years after the fact was not unreasonable under the circumstances, and there was no unreasonable delay in ODC's initiation of disciplinary proceedings thereafter. Because of the nature of the complaint, the Board does not find that the grounds alleged by Respondent constitute prejudice that requires the dismissal of this disciplinary proceeding. The Board's findings under Issue 2 require that the Board's findings under Issue 1 stand as the Board's determination that Respondent has engaged in professional misconduct.

### Standard of Review

The standard of proof required for the Board to find a violation of the Rules of Professional Conduct is by clear and convincing evidence.[6] Our scope of review of the Board's factual findings is limited to a determination of whether the record contains substantial evidence supporting the findings.[7] Our standard of review of the Board's conclusions of law is *de novo*.[8] If substantial evidence supporting the Board's decision exists in the record, and the Board has made no error of law, its decision will be affirmed on appeal.

### Violation Report Affirmed

The conduct of a person is always relevant to the question of fitness to practice law. Accordingly, the standards for admission to the Bar of this Court and the

provisions for lawyer discipline are equally important to protect both the public and the integrity of the legal profession. Delaware Rule of Disciplinary Procedure 26 provides: "There shall be no statute of limitations with respect to any proceedings under these Rules."[9] That rule is consistent with this Court's requirement for admission to the practice of law, which mandates the disclosure of all information regarding character and fitness.[10]

Although the Delaware Lawyer Rules of Professional Conduct prohibit raising a statute of limitations defense in disciplinary proceedings, they do not preclude all consideration of time lapses, or the applicability of time-bar doctrines independent of the statute of limitations. The commentary on the ABA Model Rule states that the time between the commission of the alleged misconduct and the filing of a complaint predicated thereon may be pertinent to whether and to what extent discipline should be imposed.[11] It is well settled in certain civil proceedings that, "[l]aches is an affirmative defense that the plaintiff unreasonably delayed in bringing suit after the plaintiff knew of an infringement of his [or her] rights, thereby resulting in material prejudice to the defendant."[12]

The Board recognized that Tenenbaum's assertion of a laches defense in a Delaware lawyer disciplinary proceeding presents a

---

6. *See* Rule 15 of the Board on Professional Responsibility. *Matter of Berl*, 540 A.2d 410 (Del.1988).

7. *Matter of Lewis*, 528 A.2d 1192, 1193 (Del. 1987).

8. *Matter of Berl*, 540 A.2d 410 (Del.1988) (citing *Olney v. Cooch*, 425 A.2d 610, 613 (Del. 1981)).

9. This rule is substantively the same as the ABA Model Rules for Lawyer Disciplinary Enforcement, Section II, Procedure for Disciplinary Proceedings, Rule 32, Statute of Limi-

tations. (Proceedings under these rules shall be exempt from all statutes of limitations).

10. *See* Delaware Supreme Court Rule 52(a)(1) and Board of Bar Examiners Rule 7.

11. ABA Model Rules for Lawyer Disciplinary Enforcement, § 2, R.32, Procedure for Disciplinary Proceedings, Statute of Limitations.

12. *U.S. Cellular Inv. Co. of Allentown v. Bell Atlantic Mobile Systems, Inc.*, 677 A.2d 497, 502 (Del.1996) (citing *Nationwide Mut. Ins. Co. v. Starr*, 575 A.2d 1083, 1088 (Del.1990)).

question of first impression. Although Delaware courts have not decided prior cases involving lawyer discipline that presented a laches defense, that defense has been considered in the context of other professions. In *Bash v. Board of Medical Practice,*[13] a matter involving physician discipline, a laches defense was addressed by the Superior Court:

> It has been held that there are no statutes of limitation applicable to [professional] disciplinary proceedings and therefore generally no basis for laches. Where [laches] has been successfully asserted as a defense in administrative disciplinary actions involving professional licenses, laches cannot be imputed by the mere passage of time. It must be determined from all of the circumstances of the case, one of which must be the existence of harm occasioned by the delay. The party asserting laches bears the burden of proving both that the delay was unreasonable and that prejudice resulted from the delay.[14]

We agree with the *ratio decidendi* in *Bash,*[15] and extend it to Delaware lawyer disciplinary proceedings. The Board applied that standard in considering the merits of Tenenbaum's laches defense.

We have carefully and completely reviewed the findings of fact and conclusions of law in the Board's Violation Report. The record reflects clear and convincing evidence to support the Board's findings that Tenenbaum violated his ethical re-sponsibilities. The record also reflects that the Board properly applied the *Bash* legal standard to the applicable facts in rejecting Tenenbaum's defense of laches and due process. Accordingly, we affirm both the findings of fact and conclusions of law reached by the Board on the basis of and for the reasons stated in its Violation Report.[16]

### *Disbarment Appropriate Sanction*

 "This Court has exclusive authority and wide latitude in determining disciplinary sanctions over lawyers."[17] When deciding upon the appropriate sanction, the Court must consider that "[t]he primary purpose of disciplinary proceedings is 'to protect the public; to foster public confidence in the Bar; to preserve the integrity of the profession; and to deter other lawyers from similar misconduct.' "[18] The lawyer discipline system was not designed to be either punitive or penal in nature.[19] This Court examines four factors when considering an appropriate sanction: (1) the nature of the duty violated; (ii) the lawyer's mental state; (iii) the actual/potential injury caused by the misconduct; and (iv) the existence of aggravating and mitigating circumstances.[20]

 When Tenenbaum was suspended for three years, "the evidence establishe[d] that, during the past 5–10 years, Tenenbaum [had] sexually harassed female clients and employees, both verbally and physically."[21] In this case, the clear and convinc-

---

**13.** *Bash v. Board of Medical Practice,* 579 A.2d 1145 (Del.Super.1989).

**14.** *Id.* at 1152–1153 (internal citations omitted).

**15.** *Id.*

**16.** Appendix I.

**17.** *In re Figliola,* 652 A.2d 1071, 1076 (Del. 1995) (citing *In re Agostini,* 632 A.2d 80, 81 (Del.1993)).

**18.** *Id.* quoting *In re Agostini,* 632 A.2d at 81.

**19.** *In re Rich,* 559 A.2d 1251, 1257 (Del. 1989).

**20.** *In re Figliola,* 652 A.2d at 1076.

**21.** *In re Tenenbaum,* 880 A.2d 1025, 1026 (Del.2005).

ing evidence establishes that Tenenbaum engaged in felonious conduct that would subject him to possible imprisonment, except that a criminal prosecution is barred by the applicable statutes of limitations. This evidence and the evidence from the prior suspension proceeding demonstrate that, for more than two decades, Tenenbaum has committed egregious abuses of his female clients' trust, by engaging in a repeated and systematic pattern of sexual misconduct that was not only unethical but also unlawful. Accordingly, we are in complete agreement with the analysis and recommendation in the Board's Discipline Report. We conclude that any sanction other than disbarment would not provide the necessary protection for the public, serve as a deterrent to the legal profession, or preserve the public's trust and confidence in the integrity of the Delaware lawyers' disciplinary process.

### *Conclusion*

It is ordered that Joel D. Tenenbaum be disbarred from membership in the Delaware Bar. His name shall be immediately stricken from the Roll of Attorneys entitled to practice law before the courts of this State.

### APPENDIX I

### BOARD ON PROFESSIONAL RE-SPONSIBILITY OF THE SU-PREME COURT OF THE STATE OF DELAWARE

In the Matter of a Member of the Bar of the Supreme Court of Delaware:

JOEL D. TENENBAUM, Respondent.

Board Case No. 36, 2005

---

22. Rule 8.4(b) of the Delaware Lawyers' Rules of Professional Conduct is the substantial equivalent of DR 1–102(A)(3) and provides "[a] lawyer shall not commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects."

### REPORT OF BOARD ON PROFESSIONAL RESPONSIBILITY

**A.** *The Case; Pleadings.* Pending before a panel of the Board on Professional Responsibility ("Board") is a Petition for Discipline filed October 5, 2005 in Board Case No. 36, 2005 ("Petition"), involving Joel D. Tenenbaum, Esq. ("Respondent"), a member of the Bar of the Supreme Court of the State of Delaware, currently suspended from the practice of law for a period of three years by this Court's Order of August 5, 2005. An Answer to Petition for Discipline was filed October 25, 2005 ("Answer"). The Petition and Answer are part of the Court's file and are hereby incorporated by reference into the Board's record.

**B.** *Underlying Complaint.* The Petition alleges that in or about 1983, Respondent engaged in illegal conduct involving moral turpitude. The relevant portion of the then applicable code of conduct is DR 1–102(A)(3), which prohibited illegal conduct involving moral turpitude.[22] The allegations in the Petition are based entirely upon the complaints of Carolyn Catts[23], a former client of the Respondent in or about 1983, who alleges that Respondent sexually assaulted her in his law office during an after-hours meeting at Respondent's office in the Independence Mall. At the time of the alleged assault, Ms. Catts was in her early twenties.

**C.** *Alleged Illegal Conduct.* The Petition includes three counts of illegal conduct involving moral turpitude based upon the alleged acts of Respondent:

Count 1: Indecent Exposure;

---

23. Carolyn Catts is a pseudonym for Respondent's former client, the complaining witness in this case. Her testimony appears in the Transcript under the name "Carolyn Katz" (T–68–131).

 

Count 2: Sexual Assault; and

Count 3: Unlawful Imprisonment.

**D.** *Response; Affirmative Defenses.* Respondent admits "upon information and belief" that Carolyn Catts was his client in connection with his defense of a motor vehicle DUI charge in or about 1983, but otherwise has no specific recollection of her or his representation of her (Answer; paragraphs 4, and 8 through 12; T–132; 140). Respondent denies all Counts of illegal conduct. Respondent raises the affirmative defenses of laches and violation of due process, *i.e.*, that the delay in prosecution of the disciplinary charges against him for more than 22 years constitutes actual prejudice, violating his due process rights.[24] Specifically, Respondent maintains that:

7. His file in connection with any representation of Ms. Catts was destroyed by the firm in due course approximately 7–10 years after the conclusion of the representation;

8. His time records in connection with Ms. Catts were destroyed by the firm in due course approximately seven to ten years after the conclusion of representation;

9. Any alleged furniture referenced by Ms. Catts in her complaint has not been in the possession, custody and/or control of Respondent since Respondent's firm moved from the Independence Mall to 3200 Concord Pike approximately 13 years ago;

10. Respondent's secretary died in June, 2002 and thus is unavailable as a witness;

11. Respondent has no recollection of Ms. Catts and/or of his representa-

tion of her after the passage of 22 years; and

12. Ms. Catts destroyed documents pertaining to this matter several months prior to lodging her complaint with the ODC.

**E.** *ODC's Case.* The ODC presented the following evidence in support of its case:

1. The testimony of Ms. Catts (Transcript pages 68–130; hereafter "T–___");

2. The testimony of James Layton, now a retired Delaware State Policeman and then the arresting officer in the motor vehicle DUI case in which Respondent was retained to represent Ms. Catts (T–5–29); and

3. The testimony of Stephen Christopher DeJulio, Ph.D., a clinical psychologist who testified (T–30–67) as an expert in the field of sexual abuse and assault, and resulting trauma (T–30–33). Respondent did not dispute Dr. DeJulio's expertise, but maintained the testimony was irrelevant to the proceeding (T–30, 33).

**F.** *Ms. Catts' Testimony.* Ms. Catts first testified about a driving under the influence arrest in 1983 (T–68–71; "DUI"). She then testified that she retained Respondent to represent her in connection with the DUI (T–72). After an initial meeting where Respondent agreed to take the case and established a fee ($800.00), a second meeting was scheduled in Respondent's office at 7:00 p.m., after Ms. Catts finished work (T–74). She testified that when she arrived, she was surprised because the office was empty, and had thought Respondent maintained evening hours (T–74). She met Respondent in the

---

**24.** Answer, paragraph 24; Respondent's 'Answering Brief in Opposition to the Office of Disciplinary Counsel's Proposed Findings of Fact and Conclusions of Law and Reply Brief in Support of Dismissal Filed by Respondent Joel D. Tenenbaum' (hereafter "RB-___").

lobby area and followed him into his office, where he closed and locked the door behind her (T–75). Although Ms. Catts questioned why Respondent locked the door, she accepted his answer that it was for privacy reasons (T–76). Respondent and Ms. Catts discussed the case and Ms. Catts gave Respondent the fee. After getting up to leave, and as Ms. Catts and Respondent neared the door, Respondent assaulted Petitioner. Her testimony of the details of the assault appears in the Transcript at pages 77–81 and 116–123.

Ms. Catts then testified that the Respondent told her not to tell anyone and threatened harm to her and her family if she did (T–82–83).

Ms. Catts further testified that on the day of the JP Court hearing, Respondent insisted that she sit in his car prior to the hearing and attempted to prostitute her to the arresting officer, Cpl. Layton (T–84; 124–125). Specifically, she testified that Respondent told Cpl. Layton that "she'll do anything to get off" (T–84). Cpl. Layton testified that when he pulled into the parking lot prior to the hearing, he recalled Ms. Catts sitting in the front seat of Respondent's car, and wondered why she would be seated there (T–11). He recalled having a conversation with Respondent in the parking lot prior to the hearing but did not recall the substance of the conversation (T–11–12). He did not recall any explicit offer to exchange sexual services or favors for reducing the charges or dropping the charges (T–25, 26).

Ms. Catts testified that she never told anyone about Respondent's actions at the time because she was frightened and because Respondent threatened to harm her family (T–82; 122). She only brought the matter to the attention of the Office of Disciplinary Counsel ("ODC") after read-ing an August 11, 2005 article in *The News Journal* about Respondent's three year suspension from the practice of law, based upon the Delaware Supreme Court's finding that Respondent engaged in a pattern of illegal activities involving sexual harassment of female clients and employees.[25]

**I.** *Cpl. Layton's Testimony.* Mr. James Layton, then Cpl. Layton of the Delaware State Police, verified that he was the arresting officer who issued the DUI ticket to Ms. Catts, appeared at the later arraignment in J.P. Court and appeared at trial. Most of his testimony was not based upon his specific recollection of events, except for his recollection of Respondent and Ms. Catts being seated in Respondent's convertible automobile in the parking lot of the J.P. Court when he arrived for the trial. He testified that this specific recollection was due to his prior role as arresting officer of Respondent's wife (for speeding) where Respondent had represented his wife at the same J.P. Court. The Board viewed Cpl. Layton's testimony (with the documentary evidence relating to the DUI charge and its disposition; Joint Exhibits 1–5; hereafter "Ex. ___") generally as corroborating Ms. Catts' testimony as to Respondent's representation of her, and of her testimony that she was in Respondent's car outside J.P. Court before the trial (see, generally, T–5–29).

**J.** *Dr. DeJulio's Testimony.* The Board then heard the testimony of Dr. Stephen Christopher DeJulio, who testified as an expert in the fields of sexual abuse and assault and the resulting trauma (T–32–33). In the context of his private practice in clinical psychology, Dr. DeJulio has treated and evaluated several hundred individuals who are "sexual abuse survivors" (T–32). Since 1996, Dr. DeJulio has performed consultations under contract with

**25.** Complaint, paragraph 3; T–86–88.

SOAR (Survivors of Abuse in Recovery, Inc.), a non-profit agency that provides psychological assessments and psychotherapy for survivors of sexual abuse. Dr. DeJulio has served as this agency's clinical director since September, 2004 (T–30–33; Joint Ex. 6).

Dr. DeJulio met with Ms. Catts on two occasions for about an hour, the first visit to hear about the alleged assault; the second to conduct "more of a traditional mental status exam, psychological evaluation, more of an interview assessment and some operating skills" (T–34). Dr. DeJulio testified that Ms. Catts described a number of symptoms that "were consistent with both the diagnosis of major depression and post-traumatic stress disorder" (T–34).

Dr. DeJulio related three studies he had reviewed regarding rape reporting by victims. The rates of "non-reporting" [probably more accurately described as delayed reporting] in the three studies cited by Dr. DeJulio ranged from 63% (Department of Justice, Bureau of Statistics, National Crime Victims Survey report dated 2002—only 36% of rapes were reported, T–35); to 84.9% (National Violence Against Women Survey, 1995–96—only 15.1% of rapes were reported, T–37; see generally T–34–39).

Dr. DeJulio testified that Ms. Catts' delay in reporting in this instance was both consistent with his experience in the field (T–36) and the studies he cited (T–39). He testified that he had specific discussions with Ms. Catts about the delay in reporting and found her "presentation" consistent with both the studies and other cases he had had over the years (T–39). He found in Ms. Catts the symptoms reported and experienced by victims: fear of reprisal, embarrassment and the thought that nothing would be done about it (T–37–40). Dr. DeJulio found Ms. Catts' life experiences over the past twenty years as consistent with someone who had been assaulted (T–39–41). Lastly, Dr. DeJulio testified that Ms. Catts felt that she could come forward with the reporting of the assault now, after reading the newspaper article, "because she didn't feel alone" (T–49), but that she was still terrified of coming forward and that it had been a "painful process" for her (T–47–48).

**K.** *Respondent's Testimony.* Respondent apparently learned Carolyn Catts' real name on the day of the hearing. In addition, the day of the hearing was apparently the first time he had the opportunity to see her in person (T–132). He testified that he had no recollection of Ms. Catts or of representing her (T–132). He added that based upon the testimony of Cpl. Layton, he had no doubts that he did represent her (T–132–133) and that during time period, he would schedule cases in Kent and Sussex Counties on a Friday or a Monday during July and August, apparently to coordinate with his weekend visits to his beach house in Sussex County (T–133).

Respondent testified about the type of file he would have kept at the time of his representation of Ms. Catts and stated that the file would have been destroyed at the time his office was moved from Independence Mall to Concord Pike, where his office is currently located, or otherwise in accordance with the firm's policy to destroy files after ten years (T–134–135). He testified that he had recently visited the Independence Mall space where his office had been located to refresh his memory. He described the layout of the Mall and described his first floor office as being only a sidewalk-width distant from the parking lot (T–135–138). He described his office as being 8½ feet by 11½ feet in size, the second office beyond a reception area, with a window behind his desk (T–139–140; Joint Ex. 9A & 9B). Respondent testified

he could sometimes hear conversations of people walking by the sidewalk next to the parking lot outside his office (T–145–146). Respondent drew a diagram of his office and drew in the desk, a desk chair, an armoire, a coat rack and three chairs facing the desk (T–140–142; Joint Ex. 10). Respondent denied there was ever a wing chair in his office, and stated "there was no space for a chair and nothing on the right" (T–142).

**L.** *Issues Presented.* The Board is presented with the following issues:

1. Did the ODC establish by clear and convincing evidence that Respondent engaged in illegal conduct involving moral turpitude, in violation of the then applicable DR 1–102(a)(3) of the Code of Professional Responsibility?

2. If the ODC established by clear and convincing evidence that Respondent engaged in illegal conduct involving moral turpitude, in violation of the then applicable DR 1–102(a)(3) of the Code of Professional Responsibility, should the Board nonetheless dismiss the case because of the delay of more than 22 years in the prosecution of disciplinary charges against him?

**M.** *Board Analysis–Issue 1.* The considered the following matters in analyzing Issue 1.

1. *Ms. Catts' Credibility.* The Board found Ms. Catts' testimony credible. As argued by ODC, she has no apparent reason to fabricate the assault. The statute of limitations has run for any criminal or civil litigation arising from the assault.[26] The Board found credible Ms. Catts' explanation as to why she did not come

forward with a reporting of the assault until she read the newspaper article about Respondent's suspension from the practice of law based upon findings of sexual harassment of female clients and employees (see Section H, above, generally; T–81–83; 85–88; 122; 128; 130; 58). According to Dr. DeJulio, Ms. Catts suffered substantial personal and emotional hardship as a result of coming forward and testifying (T–47–48).

2. Corroborating Testimony and Documentary Evidence. The facts relating to Respondent's representation of Ms. Catts in the DUI matter before the JP Court were corroborated by the testimony of then Cpl. Layton (T–5–29) and documentary evidence (see Joint Ex. 1–5). The fact of Ms. Catts' presence, seated in the front seat of Respondent's car outside the J.P. Court prior to the hearing as she testified, was corroborated by Cpl. Layton. He testified: "When I pulled into the court parking lot basically two things struck me. Number 1, I had—the reason I knew Mr. Tenenbaum, I had arrested his wife for speeding I'm guessing two—two months earlier, and he had represented her at the same court. And when I pulled up into the court, I recall the defendant at the time was setting in his car. And I don't remember the car, but one of the things that went through my mind, it's a nice car. Seems to me it was an expensive convertible, along those lines. And the second thing I was kind of wondering is why she was setting in the shotgun seat of the car, which would be the right

---

**26.** The Court has ruled there is no private cause of action arising from a criminal stat-

ute; see *Brett v. Berkowitz,* 706 A.2d 509, 512 (1998).

passenger, right front passenger" (T–10–11). In response to cross examination as to whether he thought that unusual, Cpl. Layton Responded, "I can't say it was unusual other than the fact that they were in the car together" (T–23). While Cpl. Layton did not definitively confirm Ms. Catts' contention that Respondent "prostituted" her to Cpl. Layton, the statement she recalls Respondent making to Cpl. Layton ("She'll do anything to get off"; T–84) was vague enough for Ms. Catts to construe it as she did and for Cpl. Layton not to have recalled an explicit offer of sexual services or favors (T–23, 25–26).

3. *Expert Testimony.* As noted above, Dr. Stephen Christopher DeJulio testified as an expert in the fields of sexual abuse and assault and the resulting trauma (T–32–33)[27]. He testified that Ms. Catts reporting in 2005 of a rape that occurred in 1983 was consistent with numerous studies on the low incidences of reporting and delayed reporting of rapes (T–34–38). Dr. DeJulio met with Ms. Catts on two occasions and performed a traditional mental status exam and a psychological evaluation (T–34). His diagnosis of Ms. Catts (major depression and post-traumatic stress disorder) based upon reported symptoms and his evaluations, are consistent with the studies and his knowledge, experience and training (T–34–40). Dr. DeJulio testified that Ms. Catts' reported life experiences, based upon his personal interviews of her, were also consistent with a person who has been sexually assaulted (T–41–42). On

27. It is noteworthy that prior to any testimony being given by Dr. DeJulio, Respondent's counsel, Mr. Weiner, noted his objection to the relevance of Dr. DeJulio's testimony, stating that "any testimony offered by Mr. DeJulio would be irrelevant for criminal purposes under Delaware law, but since we are going to have post-hearing briefing, I'll reserve that issue for post-hearing briefing . . ." (T–30;33). Respondent raised only one legal issue in his opening post-hearing brief, *i.e.,* "whether Respondent sustained actual prejudice from more than 22 years delay in the prosecution of disciplinary charges against him" ('Opening Post–Hearing Brief of Respondent Joel D. Tenenbaum'; hereafter "OB-___"; see Statement of Questions Involved and Argument sections, OB–6, 7). In his 'Answering Brief in Opposition to the Office of Disciplinary Counsel's Proposed Findings of Fact and Conclusions of Law and Reply Brief in Support of Dismissal Filed by Respondent Joel D. Tenenbaum' (hereafter "AB-___"), Respondent touched upon the issue, in the subsection of the Answering Brief supporting Respondent's overall contention that the ODC failed to establish, *by clear and convincing evidence,* that Respondent engaged in conduct involving moral turpitude (AB–1). In the subsection entitled "Moral Turpitude in Violation of Former DR 1–102(A)(3)", Respondent states: "Respondent denies that he indecently exposed himself, sexually assaulted and/or unlawfully imprisoned Ms. Catts; however, Respondent concedes that a finding *beyond a reasonable doubt* that any one of these three criminal offenses had occurred would have been sufficient to constitute moral turpitude in violation of DR 1–102(A)(3)" (AB–5). Thus it appears to the Board, by the manner in which Respondent presented issues in the post-trial briefing, that the parties agree that ODC must meet its burden of proving the charged misconduct by 'clear and convincing evidence', as required by the Delaware Lawyers' Rules of Disciplinary Procedure ("Procedural Rules"), Rule 15(c) (standard of proof) and Rule 15(d) (burden of proof), and not 'beyond a reasonable doubt', the applicable standard for proving the criminal conduct in a criminal proceeding. It further appears to the Board that Respondent abandoned the argument that Dr. DeJulio's testimony is irrelevant to these proceedings. The Board did not independently research this issue further.

cross examination, it appeared that Ms. Catts failed report to Dr. DeJulio that she had seen a psychiatrist in 2000 in connection with the divorce of her second husband (T–89, 90). It also appeared that Ms. Catts did not want Dr. DeJulio to contact Dr. Mark Glassner, her family doctor since she was 16 (T–92), to obtain her medical records. However, her explanation (that she did not want her long-time family doctor to learn about her reporting of the assault, through a request for medical records) seem plausible to the Board, and not indicative of a lack of credibility on Ms. Catts' part (T–88–97). The Board generally viewed Dr. DeJulio's testimony as supportive of Ms. Catts' testimony that she was assaulted and explanatory of her failure to report the assault.

4. *Conduct Established Supporting Disciplinary Charges.* The conduct involving moral turpitude, established by clear and convincing evidence, as presented by ODC, is as follows:

a. *Count One: Indecent Exposure*

"A person is guilty of indecent exposure if he exposes his genitals under circumstances in which he knows his conduct is likely to cause affront or alarm." 11 *Del. C.* § 768. Pursuant to Section 768, indecent exposure is a class B misdemeanor in the State of Delaware. This statute was in effect at the time of the events established by the testimony of Ms. Catts. Specifically, she testified that the Respondent took down his pants and pulled out his penis, and was grinding it on her, while putting his hand in her vagina (T–78; 120). That she was alarmed was also established by her testimony: she testified that she tried to push him away, that he was bigger than she and that she had no control; and that she tried to yell, but that he covered her mouth with his hand and told her no one could hear her because no one was in the building (T–77–78; 199–121). The Board finds that Respondent engaged in illegal conduct involving moral turpitude in violation of DR 1–102(A)(3) by indecently exposing himself to Ms. Catts as prohibited by Section 768.

b. *Count Two: Sexual Assault.*

"A person is guilty of sexual assault when he has sexual contact with another person not his spouse or causes the other to have sexual contact with him or a third person if: (1)[h]e knows that the contact is offensive to the victim; or (2)[h]e knows that the contact occurs without the consent of the victim." 11 *Del. C.* § 761. Pursuant to Section 761, sexual assault is a class A misdemeanor in the State of Delaware. This statute was in effect at the time of the events established by the testimony of Ms. Catts. Specifically, she testified that Respondent fondled her breasts and put his fingers inside her vagina (T–78–80; 120). Respondent knew the contact was offensive and that Ms. Catts did not consent to it: she testified that she tried to push him away and tried to yell. In response to her reaction, Respondent leaned his weight against her, covered her mouth with his hand, and told her no one could hear her because no one was in the building (T–77–79; 120–121). The Board finds that Respondent engaged in illegal conduct involving moral turpitude in violation of DR 1–102(A)(3) by sexually assaulting Ms. Catts as prohibited by Section 761.

c. *Count Three: Unlawful Imprisonment.*

"A person is guilty of unlawful imprisonment in the second degree when he

knowingly and unlawfully restrains another person." 11 Del. C. § 781. Pursuant to Section 781, unlawful imprisonment in the second degree is a class A misdemeanor in the State of Delaware. This statute was in effect at the time of the events established by the record evidence. Ms. Catts was locked inside the Respondent's office, and was restrained by him (T–78; 117–118). Respondent knew she was trying to get away because he held her down in the chair while she tried to push him away (T–77–79). The Board finds that Respondent engaged in illegal conduct involving moral turpitude in violation of DR 1–102(A)(3) by unlawfully imprisoning Ms. Catts as prohibited by Section 781.

**N.** *Board Findings–Issue 1.* The Board finds that the record established at the hearing demonstrates the Respondent engaged in illegal conduct involving moral turpitude, in violation of the then applicable DR 1–102(a)(3) of the Code of Professional Responsibility, and that ODC met its burden of proving the charged misconduct by clear and convincing evidence, as required by the Delaware Lawyers' Rules of Disciplinary Procedure ("Procedural Rules"), Rule 15(c) (standard of proof) and Rule 15(d) (burden of proof).

 **O.** *Board Analysis–Issue 2.* The Board next considered whether the case should be dismissed because of the delay of more than 22 years in the prosecution of disciplinary charges against Respondent.

1. Rule 26 of the Delaware Rules of Disciplinary Procedure states: "There shall be no statute of limitations with respect to any proceedings under these Rules".

2. The issue arises from Respondent's affirmative defense of laches. Respondent initially argued that it is Respondent's burden to show that he suffers actual prejudice, as a result of the delay in the prosecution of disciplinary proceedings against him, and establish actual prejudice by a preponderance of the evidence (OB–8). Respondent notes that the Delaware Superior Court has addressed the circumstances under which delay may violate due process in the context of an administrative proceeding. In *Sandefur v. Unemployment Insurance Appeals Board* [1993 WL 389217 (Del.Super.), Exhibit "A" to this Report], the Superior Court held that "rudimentary requirements of fair play" satisfy the due process requirements for administrative proceedings, citing *Mitchell v. Delaware Alcoholic Bev. Control Comm'n,* 193 A.2d 294, 312 (Del.[Del.]Super.1963), rev'd. on other grounds, 196 A.2d 410 (Del. 1963); and referencing 73A C.J.S. *Public Administrative Law and Procedure,* Section 60 (1983). The *Sandefur* Court further noted that "[A]s a general rule, an individual's due process rights are not violated, and will not affect the validity of an administrative determination, *unless actual prejudice is shown* [emphasis added].

3. Respondent's case that he suffered actual prejudice is generally based upon the six grounds set forth in Section D of this Report, above. In his Opening Brief, Respondent supports these grounds as follows:

- First, Respondent Tenenbaum, even when confronted with the physical presence of Carolyn Catts at the hearing, had no recollection of Ms. Catts and/or her representation in connection with her DUI charge (T–132).

- Second, Respondent Tenenbaum's file folder in connection with any

representation of Ms. Catts was destroyed approximately 13 years ago (T–133–134). That file folder would have contained an interview sheet, copies of any correspondence, pleadings and/or other documents pertaining to the case including, without limitation, whether or not an evening meeting was scheduled as Claimant Catts contends.

- Third, Claimant Catts shredded any documents or records that she maintained pertaining to her representation by Respondent Tenenbaum approximately two months prior to complaining to ODC (T–129–130).

- Fourth, Respondent Tenenbaum's office has not been in the Independence Mall for approximately 13 years (T–134). The parties were foreclosed from actual measurements of the office, including the desk, chairs and/or alleged wing chair. In short, the delay prevented Respondent Tenenbaum from presenting a to-scale layout of his office in 1983 to be evaluated by the Board in the light of Ms. Catts' allegations.

- Fifth, the most credible and knowledgeable independent person who could corroborate Respondent Tenenbaum's testimony that there never was a wing chair in his office, specifically, his secretary, Fran Dreisbach, died several years ago (T–144).

- Sixth, Claimant Catts asserted that she kept yelling "Why are you doing this?" "Stop." (T–121). With the passage of 22 years, Respondent Tenenbaum is foreclosed from ascertaining whether anyone, whether tenant or cleaning persons, was on the second floor above the office, on offices/doors on either side of the office, walking on the sidewalk in front of the office, and whether or not the alleged yelling was heard. Moreover, even if anyone associated with the building could be found, how could that person testify as to the absence of any "screaming" or "yelling" on an unknown weekday evening between May 14, 1983 and July 8, 1983, more than 22 years ago.

- Seventh, any physical evidence has been lost with the passage of time. Claimant Catts did not retain the clothes she wore and, although she contends that Mr. Tenenbaum "just literally like ripped them (my pants) down," the pants cannot be inspected for damage such as stretching, tearing or anything at all (T–129).

- Eighth, the leather/vinyl chairs in Mr. Tenenbaum's office went to other offices concurrent with the firm's move 13 years prior to the filing of the Complaint (T–143).

Respondent further argues in his Opening Brief that the memory of all witnesses had faded, citing examples of lack of recollection of specific events by Ms. Catts, Cpl. Layton and Respondent (OB–11).

4. ODC first argues that because Respondent threatened Ms. Catts, he has unclean hands and his equitable defenses must be rejected (AB–10). ODC argues that this factor prohibits Respondent's laches defense, as the threat of harm contributed to Ms. Catts' delay in reporting of the assault for many years (AB–10–11).

5. ODC argue that the doctrine of laches does not bar the prosecution of the charges in this proceeding, but did not apply the same test as that stated in *Sandefur*. ODC first cited two Chancery Court decisions, one limiting the application of a laches

defense when asserted against a public authority (*Singewald v. Girden*, 127 A.2d 607, 617 (Del.Ch.1956) (citation omitted) and one noting that "[i]n certain circumstances such as those involving a fiduciary, this Court may refrain from lock-step application of a legal rule that would result in an injustice and invoke its equitable powers to ensure that the dispute is resolved in a fair and just manner." *Gotham Partners v. Millwood [Hallwood] Realty Partners*, 714 A.2d 96, 104 (Del.Ch.1998) (footnote omitted).

6. ODC then applied a three-prong test for determining whether an affirmative defense of laches is met, as recited by the Delaware Supreme Court in *Homestore, Inc. v. Tafeen*, [888 A.2d 204] 2005 WL 3091887, at (Del.Supr., Nov. 17, 2005) (footnote omitted)6. ODC then applied a three-prong test for determining whether an: *i.e.*, establishing (1) knowledge by the claimant; (2) unreasonable delay in bringing the claim; and (3) prejudice to the defendant. The defense of laches can be defeated by showing that any one of these elements is missing. *Gotham Partners*, 714 A.2d at 104–105. ODC then applied the rule, *equating ODC, as the petitioning party herein, to the "claimant" in addressing the first two prongs (i.e.,* arguing that ODC, as the petitioning party, did not have knowledge of the claim until August, 2005 and thereafter, ODC, as the petitioning party, did not delay in prosecution of the charges that form the substance of this case (AB–13–15). ODC addressed the third prong of the test directly, arguing Respondent was not prejudiced by an inability to de-fend. Relevant portions of ODC's arguments follow:

- To successfully assert the doctrine of laches, the Respondent must prove that he has been prejudiced by delay. He cannot prove this element of the defense.

- The Respondent asserts that he has been prejudiced because his firm destroyed the relevant file (Tenenbaum: p.133 1.20–p.134 1.22), because his secretary at the time is now dead (Tenenbaum: p.143 1.21—p. 144 1.11), because any injuries Ms. Catts suffered cannot be examined (*cf.* Catts: p. 119 1.3–13), and because the chair onto which the Respondent ejaculated has not been tested or viewed.

- There is no prejudice however, because the file would not have had any information which would tend to prove or disprove the assault; the Respondent's secretary was not in the office at the time of the alleged assault; Ms. Catts testified that her clothing was not torn and she was not scratched or bruised (Catts: p.119 1.3–13; p.128 1.24—p. 129 1.12); in 1983 DNA evidence would not have been available [footnote omitted; see AB–16]; and the chair was within the custody, control or possession of the Respondent and not the victim or the ODC [footnote omitted; see AB–16].

- Moreover, it is immaterial that the Respondent's law firm destroyed any documents related to the representation [footnote omitted; see AB–16] because the representation is not in dispute. The destruction or loss of documents adds nothing to proving the charged misconduct. Consequently, the only value of these lost or destroyed items is that

they prove that Respondent represented Ms. Catts, a fact that ODC has already established.

- Contrary to the Respondent's claim of prejudice, the passage of time did not diminish the Respondent's ability to emphatically and vehemently deny the allegations. He denied categorically that he assaulted Ms. Catts (Tenenbaum: p. 144 1.12–16). He denied absolutely that he prostituted Ms. Catts to Trooper Layton (Tenenbaum: p,145 1.10–15). Also, the Respondent was not prejudiced because he visited the location and reviewed photographs of his former office to refresh his recollection; he reviewed documents from J.P. Court regarding Ms. Catts' hearing; and he could have visited his former law firm to inspect the furniture. The Respondent's own testimony precludes any finding of prejudice based on diminished memory or delay.

- The Respondent was able to refresh his recollection of his office despite the passage of time. Although his firm had moved from that office space in 1992 (Tenenbaum: p149 1.11–15), his visit to the strip mall where his old office was located, within 24 hours of the hearing refreshed his recollection (Tenenbaum: p.135 1.7–15). He recalled "very clearly" the layout of his office (Tenenbaum: p.135 1.4–6). He admitted he did have a lock on his office door, and admitted that he had had sex with at least one client on at least one occasion inside this office (Tenenbaum: p. 149 1.11–22). He testified in great detail regarding the office layout and furnishings (Tenenbaum: p.135 1.16; p. 140 1.5; p. 141 1.10—142 1.18; p. 142 1.24–

p.143 1.20; p. 150 1.6—p. 152 1.1; p. 158 1.24—p. 159 1.10); drew two sketches of the interior (Tenenbaum: p 140 1.6–20); and provided animated detail in response to questions by members of the Board Panel (Tenenbaum: p.155 1.17—p. 158 1.19; p.159 1.11–18). Also, as an additional method of refreshing his recollection, the Respondent produced at the hearing two photographs of his 50th birthday party given by staff at this office location [footnote omitted; AB–17]; (Tenenbaum: p 140 1.22—p. 141 1.13; p.152 1.2–11).

7. ODC then noted that it is consistent with public policy, and Delaware Supreme Court Rules of Disciplinary Conduct, Rule 26, to reject a statute of limitations for disciplinary matters (AB–18).

8. The Board questioned the propriety of considering the actions of ODC, as the party initiating the action in the context of a lawyer disciplinary proceeding, rather than the actions of the complaining party, in applying the first two prongs of the above-cited three-prong test, for determining whether an affirmative defense of laches is met. The Board requested supplemental briefing on this issue. ODC and Respondent both provided supplemental memoranda in response to the Board's request.

9. Respondent contends that this proceeding is a case of first impression in Delaware; i.e., it is the first time that delay has been presented as an affirmative defense to disciplinary charges against an attorney (OB–7). ODC states "No Delaware court has specifically addressed the issue of laches in a lawyer misconduct pro-

ceeding" (ODC–SM–7). Based upon the submissions provided by the parties, and without extensive independent research to confirm, the Board believes this is the case. ODC did note in its Answering Brief that the Delaware Supreme Court "did not hesitate to suspend a Delaware lawyer in 1993 for misconduct which had taken place at an unspecified time between 1978 and 1989" (citing *In re Barrett*, 630 A.2d 652, 653 (Del.1993)) and further noted that "the Court held Barrett responsible for the loss of client property despite the passage of time, Barrett's inability to recollect the matter, and the unavailability of the firm's files (*Id.* at 655, 657). However, it does not appear that Barrett raised delay as an affirmative defense.

10. Both parties cite *Kotler v. Board of Medical Practice*, 630 A.2d 1102 (Del.1993) (Exhibit B to this Report) as directly applicable to the issue of the application of the doctrine of laches to an administrative proceeding seeking to suspend or revoke a professional's license. The Delaware Supreme Court has held that the interest in *not* applying the doctrine is substantial": "Although courts generally apply general Statutes of Limitation to administrative proceedings, the opposite is true with respect to proceedings which are in the public interest such as proceedings to suspend or revoke a license to practice medicine. Thus, courts have held without exception that, in the absence of a statute which applies specifically to medical license revocation proceedings, Statutes of Limitation do not apply to such disciplinary proceedings. The rationale behind this rule, when enunci-

ated by the Courts, is twofold: first, when the state regulates the medical profession, it is acting in its sovereign capacity and for the public good, and therefore general civil and criminal Statutes of Limitations do not apply; and second, the purpose of general Statutes of Limitation is to discourage unnecessary delay, promote justice, and forestall prosecution of stale claims, or as proceedings to revoke physicians' licenses, serve to protect the public by insuring that only properly-qualified individuals practice medicine, and the staleness of the charges do not necessarily make them reflect less on the character of the person charged.

"Those courts that follow the same rule with respect to the doctrine of laches, that is, that laches do not operate as a bar to proceedings to revoke or suspend physicians' licenses, apply a similar rationale: latches cannot attach when the state is acting in its sovereign capacity to protect a public right. On the other hand, several courts have expressed the view that while the mere passage of time is not sufficient to support the defense of laches, if a doctor could prove that his defense was prejudiced due to an unreasonable delay, laches might act as a bar to the license revocation proceeding. *Natalyn O. Harlow*, ANN: Applicability of Statute of Limitations or Doctrine of Laches to Proceedings to Revoke or Suspend License to Practice Medicine, 51 A.L.R.4th 1147, 1151–52 (1987)."

11. Respondent states in 'Respondent Tenenbaum's Supplemental Memorandum' at page2 (hereafter "R–SM–___"): "There cannot, however, be any dispute that Delaware has joined the Courts that have

held that if a professional could prove that his defense was prejudiced due to an unreasonable delay, laches might act as a bar to the license revocation proceedings", noting the Court's reference in *Kotler* to the case of *Bash v. Board of Medical Practice,* 579 A.2d 1145 (Del.Super.1989) (Exhibit C to this Report). In *Bash,* the Superior Court stated "It has been held that there are no statutes of limitation applicable to disciplinary proceedings and therefore generally no basis for laches. *Id.* at 1152, citing *61 Am.Jur. 2nd, Physicians, Surgeons and Other Healers,* § 104 (1981). The *Bash* Court continued: "Where it has been successfully asserted as a defense in administrative disciplinary actions involving professional licenses, laches cannot be imputed by the mere passage of time. It must be determined from all the circumstances of the case, one of which must be the existence of harm occasioned by the delay." *Id.* The Superior Court further stated that "(t)he party asserting laches bears the burden of proving both that the delay was unreasonable and that prejudice resulted from the delay." *Id.,* at 1153, citing *Appeal of Plantier,* 126 N.H. 500, 494 A.2d 270 (1985), citing *Tighe v. Commonwealth State Board of Nurse Examiners,* 40 Pa. Cmwlth. 367, 397 A.2d 1261 (1979). The party asserting laches bears the burden of proving both that the delay was unreasonable and that prejudice resulted from the delay. *Appeal of Plantier, supra.*

12. The Board believes the standards for addressing laches defenses, as set forth in *Kotler* and *Bash,* are appropriately applied to lawyer disciplinary cases, as the government interests in protecting the public and upholding the integrity of the profession are just as applicable to the legal profession as they are to the medical profession.

13. ODC cited *Kotler* and *Bash* as applicable to the laches issue as well, but also relied on *Bash* in response to the issue of whether the focus of the 'delay' is appropriately the ODC (the Board of Medical Practice in *Bash*) or the complaining party. ODC noted in it's Supplemental Memorandum, p. 5 (hereafter ODC–SM–___") "[B]ecause the only delay was that of the complaining patients—the Board having initiated action within months of receipt of the complaints—it must be concluded that the Court considered the actions of the Board of Medical Practice in this regard, and not timing of the reports by the two female patients who had complained in 1987 and 1988 that each had been assaulted in 1971".

14. Respondent cites case law supporting the proposition that laches may bar untimely prosecution based on prejudicial delay attributable to the prosecuting entity (R–SM–4–5) *and* that laches may also be based upon prejudicial delay attributable to the original complainant (R–SM–6–8), concluding that "there is no distinction to be drawn between prejudicial delay attributable to the prosecuting entity and that of the original complainant" (R–SM–9–10). After reviewing all cases cited (including cases cited by ODC that it is appropriate to focus on delay attributable to the disciplinary body in the laches analysis; ODC–SM–7–8), and in light of the hold-

ings and rationale of *Kotler* and *Bash*, the Board agrees with Respondent's conclusion on this point.

15. ODC notes the similarities of the facts and circumstances in the *Bash* case to those of this proceeding. ODC argues: "The *Bash* case is instructive for the case now before the Board on Professional Responsibility. As was true in *Bash*, the present lawyer disciplinary matter addresses an allegation of serious sexual misconduct by a male professional with a female client in violation of applicable professional conduct rules. In *Bash*, complaints were made in 1987 and 1988 regarding misconduct alleged to have occurred in 1971—a difference of at least 17 years. In the instant case, a complaint was made in 2005 regarding misconduct alleged to have occurred in 1983—a difference of 22 years. In the *Bash* case, the Board of Medical Practice filed a formal complaint in July 1988, having received complaints in late 1987 and early 1988. In the instant case, the complaint was made on August 17, 2005; the Respondent was notified on August 22, 2005; a Petition for Discipline was approved by the Preliminary Review Committee and filed by the ODC on October 5, 2005 (ODC–SM–5–6).

16. ODC further analogizes the *Bash* Court's consideration of the laches defense and Bash's claims of prejudice to the instant case. ODC argues: "The allegations in *Bash* were as follows: one female patient stated that Dr. Bash had sexual intercourse with her during a therapy session in 1971; one female patient stated that Dr. Bash gave her a firm kiss on the mouth at the end of a therapy session in 1971; and the third female patient stated that Dr. Bash had inappropriately touched her breasts at the end of a therapy session in 1987. *Id.* at 1147. The three female patients testified and Dr. Bash testified, as well as two other psychiatrists. *Id.* at 1148. The Superior Court found that Dr. Bash was not prejudiced. The Court stated:

'Dr. Bash has not specifically identified any witnesses who have become unavailable or evidence which has been lost due to the passage of time. Instead, the substance of his laches argument seems to be that the passage of time somehow makes his version of the facts more credible and the Panel's refusal to believe his version amounts to prejudice. On this record, the Court finds that Dr. Bash has not established a defense in this case under the doctrine of laches". *Id* at 1153. (ODC–SM–6).

17. The Board does not agree that the grounds for the *Bash* Court's findings are directly analogous to the instant case. Repondent [Respondent] argues, *inter alia*, that "the most credible, knowledgeable independent person who could corroborate that there never was a wing chair in his office, specifically his secretary, Fran Dreisbach, died several years ago" (OB–10). However, for the reasons set forth in Section N(5) of this Report, the Board does not find that Respondent has met his burden of showing prejudice resulting from delay.

18. The Board further finds that the delay in this instance, attributable to the complainant Ms. Catts and not the ODC, was not unreasonable, based upon the testimony of

Ms. Catts, as reviewed in Section F and M(1) of this Report, and the testimony of Dr. DeJulio, as reviewed in Sections J and M(3) of this Report.

**P.** *Board Findings–Issue 2.* The Board finds that the public interests at issue and the standards limiting laches defenses set forth in the *Kotler* and *Bash* cases are as applicable to lawyer disciplinary proceedings as to physician disciplinary proceedings. The Board finds that Respondent did not meet his burden of proving both that the delay in the initiation of disciplinary proceedings was unreasonable, and that prejudice resulted from the delay. The Board finds that Ms. Catts' reporting of the assault nearly 22 years after the fact was not unreasonable under the circumstances, and there was no unreasonable delay in ODC's initiation of disciplinary proceedings thereafter. Because of the nature of the complaint, the Board does not find that the grounds alleged by Respondent constitute prejudice requiring the dismissal of this disciplinary proceeding. The Board's findings under Issue 2 require that the Board's findings under Issue 1 stand as the Board's determination that Respondent has engaged in professional misconduct.

**Q.** *Sanctions.* Rule 9(d) of the Delaware Rules of Disciplinary Procedure provides in part that "[I]f the Board initially finds that the Respondent has engaged in professional misconduct, the Board shall then make a separate finding as to the appropriate disciplinary sanction". The Rule further provides that "the Board may conduct a separate hearing on sanctions in order to evaluate evidence of possible aggravating and mitigating factors. The ODC and counsel for Respondent are hereby requested to confer and either agree to submit memoranda to the Board with their respective positions on sanc-

tions, within twenty (20) days of the date of this Report, or to schedule a hearing through Mr. Stephen Taylor, contacting Mr. Taylor in either event within seven (7) days of the date of this Report.

Dated: May 8, 2006

APPENDIX II

**BOARD ON PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF THE STATE OF DELAWARE**

In the Matter of a Member of the Bar of the Supreme Court of Delaware:

JOEL D. TENENBAUM, Respondent.

Board Case No. 36, 2005

**REPORT OF BOARD ON PROFESSIONAL RESPONSIBILITY**

Pending before a panel of the Board on Professional Responsibility is Board Case No. 36, 2005, involving Joel D. Tenenbaum, Esq. ("Respondent"), a member of the Bar of the Supreme Court of the State of Delaware, currently suspended from the practice of law for a period of three years by this Court's Order of August 5, 2005 in: *Matter of Tenenbaum*, Board Case Nos. 48 and 52, 2004. The hearing in the above-captioned case was held November 16, 2005. Post hearing briefing was completed as of February 9, 2006. The Board requested that the parties supplement post-hearing briefing to address an issue pertaining to a legal defense, and these submissions were received by the Board April 7, 2006.

The Board filed its Report with the Delaware Supreme Court on May 8, 2006 ("Board Report" or "BR-___"). The Board framed its Report to address two issues presented, restated here:

3. Did the ODC establish by clear and convincing evidence that Respondent engaged in illegal conduct involving

moral turpitude, in violation of the then applicable DR 1–102(a)(3) of the Code of Professional Responsibility?

4. If the ODC established by clear and convincing evidence that Respondent engaged in illegal conduct involving moral turpitude, in violation of the then applicable DR 1–102(a)(3) of the Code of Professional Responsibility, should the Board nonetheless dismiss the case because of the delay of more than 22 years in the prosecution of disciplinary charges against him?

The Board's findings on these issues, as set forth in the Board Report, are restated

1. The Board finds that the record established at the hearing demonstrates the Respondent engaged in illegal conduct involving moral turpitude, in violation of the then applicable DR 1–102(a)(3) of the Code of Professional Responsibility, and that ODC met its burden of proving the charged misconduct by clear and convincing evidence, as required by the Delaware Lawyers' Rules of Disciplinary Procedure ("Procedural Rules"), Rule 15(c) (standard of proof) and Rule 15(d) (burden of proof).

2. The Board finds that the public interests at issue and the standards limiting laches defenses set forth in the *Kotler* and *Bash* cases are as applicable to lawyer disciplinary proceedings as to physician disciplinary proceedings. The Board finds that Respondent did not meet his burden of proving both that the delay in the initiation of disciplinary proceedings was unreasonable, and that prejudice resulted from the delay. The Board finds that Ms. Catts'[28] reporting of the assault nearly 22 years after the fact was not unreasonable under the circumstances, and there was no unreasonable delay in ODC's initiation of disciplinary proceedings thereafter. Because of the nature of the complaint, the Board does not find that the grounds alleged by Respondent constitute prejudice requiring the dismissal of this disciplinary proceeding. The Board's findings under Issue 2 require that the Board's findings under Issue 1 stand as the Board's determination that Respondent has engaged in professional misconduct.

Rule 9(d) of the Delaware Rules of Disciplinary Procedure provides in part that "[I]f the Board initially finds that the Respondent has engaged in professional misconduct, the Board shall then make a separate finding as to the appropriate disciplinary sanction". The Rule further provides that "the Board may conduct a separate hearing on sanctions in order to evaluate evidence of possible aggravating and mitigating factors". Counsel for Respondent requested a hearing on sanctions, which was held July 11, 2006. ODC filed a Memorandum of Law Addressing Sanctions prior to the hearing (hereafter "ODC Memorandum"). Respondent also filed a Memorandum of Law Addressing Sanctions, by agreement with ODC and approval of the Board, following the hearing hereafter "Respondent's Memorandum"). This is the Board's Report on sanctions.

---

**28.** Carolyn Catts is a pseudonym for Respondent's former client, the complaining witness in this case. BR–2, Note 2.

In the performance its analysis and determination of the appropriate sanction, the Board is given specific guidance:

The objectives of the lawyer disciplinary system are to protect the public, to protect the administration of justice, to preserve confidence in the legal profession, and to deter other lawyers from similar misconduct. To further these objectives and to promote consistency and predictability in the imposition of disciplinary sanctions, the Court looks to the ABA Standards for Imposing Lawyer Sanctions as a model for determining the appropriate discipline warranted under the circumstances of each case. The ABA framework consists of four key factors to be considered by the Court: (a) the ethical duty violated; (b) the lawyer's mental state; (c) the extent of the actual or potential injury caused by the lawyer's misconduct; and (d) aggravating and mitigating factors." *In re Bailey*, 821 A.2d 851, 866 (Del.2003) (Citations omitted); See also *In re Fountain*, 878 A.2d 1167, 1173 (Del.2005).

The Board now considers those four enumerated factors. After reviewing the first three factors, and making a preliminary determination of the appropriate sanction, the Board will then review the aggravating and mitigating circumstances to determine if an increase or decrease in the sanction is warranted. *In re Steiner*, 817 A.2d 793, 796 (Del.2003).

### 1. *Ethical Duty Violated.*

The Board found that Respondent violated the duties owed by a Delaware lawyer to the public under the then applicable code of conduct, DR 1–102(A)(3) [29], which prohibited illegal conduct involving moral turpitude. The Board believes that the specific conduct in which the Respondent engaged, as found by the Board, rises to the level of conduct for which the applicable ABA Standard (ABA Standard 5.1) suggests disbarment as an appropriate remedy. A further discussion or the Board's rationale appears in Section 4, below.

### 1. *The Lawyer's Mental State.*

An analysis of this factor requires a determination of the lawyer's state of mind, *i.e.*, whether it was intentional, knowing or negligent. The ODC, arguing that the Respondent acted intentionally, noted:

The most culpable mental state is that of intent, when the lawyer acts with the conscious objective or purpose to accomplish a particular result (citing ADA Standards, Theoretical Framework; Black Letter Rules, Definitions; *In re McCoy*, 767 A.2d 191, 195 (Del.2001) ("Intentional misconduct is the most culpable form of misconduct."). ODC Memorandum, p. 3.

Respondent urges that the Board must include consideration of his personal and emotional problems, as discussed in the Professional Renewal Center's February 4, 2005 letter/report ("PRC Report") which, as noted in Respondent's Memorandum, includes "diagnosis of Major Depressive Disorder, Recurrent, Moderate; Dysthymic Disorder; and Personality Disorder NOS with Narcissistic and Histrionic Features." Respondent's Memorandum, p. 2. Respondent offered the PRC Report at the conclusion of the Hearing on sanctions as an Exhibit, since it was referenced in the Supreme Court's August 5, 2005 Order in:

---

**29.** Rule 8.4(b) of the Delaware Lawyers' Rules of Professional Conduct is the substantial equivalent of DR 1–102(A)(3) and provides "[a] lawyer shall not commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects."

*Matter of Tenenbaum,* Board Case No. 36, 2005. Respondent's counsel suggested that review of the PRC Report would allow the Board to consider the underlying bases to references to the PRC Report in the Supreme Court's Order of August 5, 2005 in: *Matter of Tenenbaum,* Board Case Nos. 48 and 52, 2004.[30] A copy of the Professional Renewal Center's February 4, 2005 letter/report is attached to this Report as Exhibit "A".

The Board did review the PRC Report (along with the entire Board Report, attached to the Supreme Court's Order of August 5, 2005), without the benefit of testimony as to whether any of these conditions directly or indirectly negate intentional conduct, or support a finding of a lesser mental state of mind. The Board notes particularly portions of the PRC Report that seem to have a bearing on the issue of intent:

> "There are numerous significant discontinuities between Mr. Tenenbaum's perceptions of his behaviors and those of the witnesses described in Mrs. Rocanelli's documents. Some possible hypotheses to explain these discontinuities will be discussed later in this report" (PRC Report, Relevant History Section, fourth paragraph, p. 3).
>
> "Mr. Tenenbaum possesses significant narcissistic and histrionic personality traits. His obliviousness in certain social situations can be attributed to a predominant "thick-skinned" narcissistic character structure. In this regard, he can be self-centered, episodically hedonistic, predisposed to use arrogance as a way to fend off internally perceived inadequacies, and possesses significant

deficits in this ability to use empathy to be more self-reflective and sensitive to other people's needs and boundaries. When he becomes beset with high levels of stress, however, his personality structure shifts to a more "thinned-skinned" narcissistic presentation—that is, he can become more inhibited and timid, more dependent on others, naïve in his understanding of social contexts, overly sensitive to perceived slights from others, and beset with feelings of low self-esteem.

Presently, he is quite vulnerable and struggling to manage intense feelings of helplessness that are intruding into consciousness in the form of unbidden disturbing ideas and feelings that give rise to significant levels of anxiety. Despite being overwhelmed, he is not exhibiting a significant regression in his ability to think logically. *There are no indications in the psychological test data to suggest the presence of a severe mood disorder, a thought disorder, a psychotic process, psychopathy, or impulse control disorder.* His predominant modes of psychological defense are repression, somatization, projective identification, and externalization. These psychological defenses prevent him from accurately seeing the way in which his conduct and choices can affect others and, as a result, predispose him to minimize, and thus have little insight into his difficulties. (PRC Report, Summary of Psychological Testing Section, fifth and sixth paragraphs, p. 8 [emphasis added] ).

These statements in the PRC Report lead the Board to surmise that although Respondent may have some psychological

---

**30.** In that combined case, Respondent and ODC stipulated (as a mitigating factor) that the Respondent "has experienced personal and emotional problems, including diagnosis of as a result of Major Depressive Disorder, Recurrent, Moderate; Dysthymic Disorder; and Personality Disorder NOS with Narcissistic and Histrionic Features", referencing the PRC Report, Joint Exhibit 3 to the Board Report to the Court.

impediments to discerning the line one should not cross in expressing oneself in a business or social context, the PRC Report does not support a finding of Respondent's resulting diminished mental state. The Board also noted Respondent's own testimony, as contained in the Board's Report in the prior case, as supportive of a finding of an intentional state of mind:

"He testified briefly regarding the sexual relationship he had with a client during the course of his representation in 1998, noting that this came to light as a result of his admission of that relationship, and not as a result of a complaint to the ODC (T–177–178). He acknowledged that this conduct was wrong ("*malum prohibitum*" and "*malum in se*") even prior to the Rule change (T–177–178)."

It is difficult for the Board to decide that Respondent, knowing the wrongfulness of having sex with a client, did not know the criminal conduct at issue in the case before the Board was wrongful, as well. The Board concludes the Respondent acted intentionally.

3. *The Extent of the Actual or Potential Injury Caused by the Lawyer's Misconduct.*

ABA Standards (Black Letter Rules) state "injury" is harm to a client, the public, the legal system or the profession which results from a lawyer's misconduct. The level of injury can range from "serious" injury to "little or no injury". The Board believes that Ms. Carolyn Catts suffered actual injury, as did the public and the legal profession, as a result of Respondent's conduct.

4. *Initial Assessment of Sanctions.*

As an initial matter, and based upon Respondent's mental state, and the actual or potential injury suffered, the Board begins its analysis with ABA Standard 5. 1, Failure to Maintain Personal Integrity, which states:

"Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or in cases involving dishonesty, fraud, deceit, or misrepresentation:

Section 5.11: Disbarment is generally appropriate when:

(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or

. . .

(b) a lawyer engages in other intentional conduct involving dishonesty, fraud, deceit, or misrepresentations that seriously adversely reflects on the lawyer's fitness to practice."

The ODC argues, but the Board does not agree, that a violation of ABA Standard 5.11(a) has been established. ODC argues that the Board "found that Corporal Layton's testimony corroborated Ms. Catts' testimony. BR 9–10" (ODC Memorandum, p. 3). ODC cites the Board's statement from the Board Report: "While Cpl. Layton did not definitely confirm Ms. Catts' contention that Respondent 'prostituted' her to Cpl. Layton, the statement she recalls Respondent making to Cpl. Layton ("She'll do anything to get off"; T–94) was vague enough for Ms. Catts to construe it as she did and for Cpl. Layton not to have recalled an explicit offer of sexual services or favors (T–23, 25–26). BR–10" (ODC Memorandum, p. 3, 4).

The Board clarifies here that its reference to this testimony was intended to convey its belief that Cpl. Layton's testimony (that he did not recall any explicit offer of sexual services or favors) did not contradict or negate Ms. Catts' *belief* that Respondent had 'prostituted' her, nor did it lessen her credibility. However, Ms. Catts' recollection of this statement, by itself, does not support a finding, by clear and convincing evidence, that Respondent interfered with the administration of justice. The Board did not make such a finding in its Board Report.

It remains, then, to determine whether a violation of ABA Standard 5.11(b) has been established. In the Board Report, the Board found that ODC established by clear and convincing evidence (but not through criminal conviction) that Respondent engaged in criminal conduct, *i.e.*, sexual assault, indecent exposure and unlawful imprisonment. The Board believes that this criminal conduct meets the *general language and intent* of Standard 5.0 (*i.e.*, "the following sanctions [disbarment] are generally appropriate in cases involving *commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects ...* " [emphasis added]). Whether the conduct in this case, egregious as it is, specifically involves "dishonesty, fraud, deceit, or misrepresentation" as required under Section 5.11(b), is a more difficult question, as each of these terms denotes a dishonest motive or an intent to mislead. Neither the ODC nor Respondent cites Delaware or other case law directly on this point. The Board reviewed numerous cases from other jurisdictions (see, e.g., 43 A.L.R.4th 1062, "Sexual Misconduct as Ground for Disciplining Attorney or Judge", and cases cited therein) and find there is support for both suspension and disbarment of attorneys in cases of serious sexual misconduct. The Board finds support for its belief that the improper sexual behavior in this case warrants disbarment, even if the Respondent's conduct may arguably not involve "dishonesty, fraud, deceit, or misrepresentation". For example, in *In re Gould*, 4 A.D.2d 174, 164 N.Y.S.2d 48 (1957), the Court noted, in response to the respondent's claim that he was insane at the time of the commission of the acts, and ordered disbarment:

> "This may be a defense to a criminal charge, where the intent to commit the wrongful acts is a necessary ingredient; but in disciplinary proceedings, dependent upon the nature of the misconduct, the attorney's conduct may be judged not only by his intent but also by the objective nature of his conduct and the quality of his act. A disciplinary proceeding is not concerned with meting out punishment but with the question of fitness to continue on the role of qualified attorneys. The primary consideration is the protection of the public in its reliance upon the integrity and responsibility of the legal profession. Practitioners, whether incapable or unwilling to distinguish between right and wrong, cannot be allowed to remain members of the Bar." *In re Gould*, 4 A.D.2d 174, 176, 164 N.Y.S.2d 48, 49 (1957).

A copy of this decision is attached to this Report as Exhibit "B". Lastly, the Board notes that the ABA Standards are intended to serve as guidelines, and based upon the foregoing, the Board believes the appropriate initial sanction is disbarment.

5. *Aggravating and Mitigating Factors.*

*Aggravating Factors*

As indicated in the previous subsection, the initial considerations indicate disbarment is the appropriate sanction. However, ABA Standard Section 9.21 provides

that aggravation or aggravating circumstances may justify an increase in the degree of discipline to be imposed; and ABA Standard Section 9.31 provides that mitigation or mitigating circumstances may be considered as factors that justify a reduction in the degree of discipline to be imposed. The Board now reviews any aggravating or mitigating factors.

*ABA Standard Section 9.22(a)—"Prior Disciplinary Offenses".* The ODC notes Respondent's prior disciplinary record:

- In 1984, Respondent was privately admonished for a violation of Canon 1, DR 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation), and DR 1–102(A)(5) (engaging in conduct prejudicial to the administration of justice), based upon Respondent's false testimony in support of a claim for fees;
- In 1995 Respondent was privately admonished for violations of Rules 3.3(a)(2) (knowingly failing to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client) and Rule 8.4(d) (engaging in conduct prejudicial to the administration of justice) in his failure to disclose to the Family Court certain matters pertaining to Respondent's client; and
- In 2005, Respondent was suspended for three years for violations of former Rule 1.7(b), Rules 1.8(j), 8.4(a) and 8.4(b), wherein the Respondent was suspended for three years with the Court's finding that Respondent had sexually harassed female clients and employees, both verbally and physically during the past five to ten years, establishing a pattern of illegal activities. ODC Memorandum, pp. 4, 5.

Respondent argues that, notwithstanding the last recited, prior *discipline* for sexual *misconduct* involving clients and office staff, the *conduct* at issue before the Board predates the violations that are the grounds for his current three-year suspension, and thus the prior-in-time violations "should not be considered as aggravated by this previous discipline, based upon events and sanctions which occurred after the alleged event giving rise to the Board's finding". Respondent's Memorandum, pp. 3, 4. Respondent supports this argument with analogies to Delaware case law that confirms the requirement of separate convictions, each successive to the other, with opportunity for a criminal defendant's rehabilitation after each sentencing, in the application of the habitual criminal offender penalties (see Respondent's Memorandum, citing: *Buckingham v. State*, 482 A.2d 327, 330–331 (Del.1984); *State v. Colon*, [2006 WL 1067282 (Del.Super.)]). ODC notes without authority that "it would not be appropriate to consider in mitigation the fact that Respondent did not have a disciplinary record as of 1983" ODC Memorandum, p. 6.

In addressing a similar assertion (*i.e.,* that prior discipline should not be considered an aggravating factor relevant to the Court's consideration of current misconduct), The Supreme Court of Florida stated:

"McHenry asserts that his past disciplinary record should not be considered an aggravating factor relevant to our evaluation of the appropriate discipline for the present charges against him. We recognize that McHenry's prior violations of the professional rules were associated with and explained somewhat by this former addition to alcohol. Even so, his prior conduct sheds light upon his character and fitness to practice law. His behavior toward two of his clients in the two separate incidents at issue in this case demonstrates severe moral turpitude, and his character and conduct

are wholly inconsistent with approved professional standards." *The Florida Bar v. McHenry*, 605 So.2d 459, 17 Fla. L. Weekly S598 (1992).

A copy of this decision is attached to this Report as Exhibit "C".

Based upon this reasoning, and the premise that the ABA Standards are intended as guidelines, the Board believes the violations that are the grounds for Respondent's current three-year suspension, may be considered as aggravating circumstances. Conversely, the Board believes that the lack of a disciplinary violation in 1983 is not an appropriate factor in mitigation in this proceeding.

*ABA Standard Section 9.22(b)—"Dishonest or Selfish Motive"*. ODC states, without further notation that "the Respondent acted from a dishonest and selfish motive". ODC Memorandum, p. 4. Again, the Board questions whether the conduct at issue meets the definition implied in these terms, but does not feel its decision is affected by this question.

*ABA Standard Section 9.22(c)—"Pattern of Misconduct"*. After noting Respondent's prior disciplinary record, ODC argues that this prior record establishes a pattern of misconduct. ODC Memorandum, p. 4. The Board agrees.

*ABA Standard Section 9.22(d)—"Multiple Offenses"*. ODC notes that "even viewing the Respondent's assault on Ms. Catts in isolation, multiple offenses were involved; BR 11–14". ODC Memorandum, p. 5). The Board agrees.

*ABA Standard Section 9.22(g)—"Refusal to Acknowledge Wrongful Nature of Conduct"*. ODC states that "Respondent has not acknowledged the wrongful nature of his conduct". Respondent has maintained throughout this proceeding that the conduct alleged did not occur.

*ABA Standard Section 9.22(i)—"Substantial Experience in the Practice of Law"*. Respondent, admitted to the Delaware Bar in 1972, had practiced law for a period of ten years at the time of the alleged assault of Ms. Catts.

### Mitigating Factors

The ABA Standards, at Section 9.32, set forth numerous factors that may serve in mitigation.

Mitigating factors can include:

(a) absence of a prior disciplinary record;

(b) absence of a dishonest or selfish motive;

(c) personal or emotional problems;

(d) timely good faith effort to make restitution or to rectify consequences of misconduct;

(e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;

(f) inexperience in the practice of law;

(g) character or reputation;

(h) physical disability;

(i) mental disability or chemical dependence including alcoholism or drug abuse when:

　(1) there is medical evidence that the respondent is affected by a chemical dependence or mental disability;

　(2) the chemical dependency or mental disability caused the misconduct;

　(3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation;

　(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

(j) delay in disciplinary proceedings;

(k) interim rehabilitation;

(*l*) imposition of other penalties or sanctions;

(m) remorse;

(n) remoteness of prior offenses.

ODC suggests, generally, that mitigating factors do not support a decrease in sanctions in this case. The Board has already addressed the issue of Respondent's prior disciplinary record (see discussion above under "Prior Disciplinary Offenses") and Respondent's disability or impairment (see Section 2, above, "The Lawyers Mental State"). There are two other issues involving mitigation which are raised by Respondent: Respondent's record of public and community service, and Respondent's lack of conviction of any serious criminal act in connection with this violation. The Board will address these alleged mitigating factors, in reverse order.

Respondent distinguishes cases cited by ODC as supporting the sanction of disbarment: *In Re: Vinokur*, [2003 WL 23111988 (Del.)] and *In Re: Fink*, [2003 WL 21295919 (Del.)]. Respondent correctly notes that *Vinokur* consented to the sanction of disbarment, and that *Fink* was charged and convicted beyond a reasonable doubt of 30 felony counts (confirmed on appeal). In addition, *Fink* ultimately stipulated to disbarment from the practice of law, without further proceedings. (Respondent's Memorandum, p. 4). The fact that Respondent distinguishes the above cases from the facts and circumstances presented in this case, however, goes to the issue of the propriety of the initial finding of disbarment as an appropriate sanction, rather than to the issue of mitigation. The Board is unaware of any Delaware case law addressing disciplinary cases involving serious criminal conduct without a criminal conviction. For reasons set forth in its discussion on ABA Standard Section 5.11, above, the Board believes that disbarment may be an appropriate initial sanction, in cases of serious criminal behavior established by clear and convincing evidence, subject to modification as a result of aggravating or mitigating factors.

The Board does believe that Respondent's record of substantial public and community service, throughout the course of his legal career, is a factor in mitigation (generally, character or reputation). The Board felt that Respondent's significant work with the Community Legal Aid Society, Inc., Catholic Charities and his related work in the area of termination of parental rights and child adoption, including his participation in establishing important legal precedent in these areas of practice, is a positive factor (see Transcript of Board Hearing 7/11/2006, pages 4–14; hereafter "T-___"). Likewise, Respondent's participation in the Delaware State Bar Association, chairing the Delaware State Bar Family Law Section, and later chairing the Adoption Committee of the American Bar Association Family Law Section, reflects positively on Respondent. In both of these organizations, Respondent worked to have important legislation passed, including the Uniform Adoption Act (T–15–19).

The Board does not believe, however, considering all of the facts and circumstances before it and the aggravating factors, that the mitigating factors should operate to reduce the sanction of disbarment. The Board recommends that the Court enter an order imposing the sanction of disbarment.

Dated: October 17, 2006